Filed 9/21/15  In re N.V. CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| In re N.V., a Person Coming Under the Juvenile Court Law. | C078410 |
| SACRAMENTO COUNTY DEPARTMENT OF HEALTH AND HUMAN SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>J.V.,<br><br>Defendant and Appellant. | (Super. Ct. No. JD235314) |

Mother, J.V., appeals from the juvenile court's dispositional orders removing the minor from her care.  (Welf. & Inst. Code, §§ 300, 361, 395.)[1]  She contends the juvenile court improperly considered extraneous evidence, to her prejudice, and that there were reasonable alternatives to removal.

We affirm.

---

[1]  Further undesignated statutory references are to the Welfare and Institutions Code.

## FACTUAL AND PROCEDURAL BACKGROUND

### The Petition

On October 27, 2014, the Department of Health and Human Services (DHHS) filed section 300 petition on behalf of newborn N.V., alleging that mother had an untreated substance abuse problem from which she had failed and/or refused to rehabilitate which impaired her judgment and ability to care for the minor, and placed him at substantial risk of harm, abuse, or neglect. The petition alleged mother and the minor had tested positive for methamphetamine and amphetamine at the time of the minor's birth, and that mother had been advised not to breast-feed but did so anyway against medical advice. It also alleged that mother had a history of drinking excessive amounts of alcohol and regularly drank alcohol after she knew she had become pregnant.

### Information from the Detention Report

According to the detention report, after birth, the minor tested positive for methamphetamine and amphetamine and mother had displayed odd behavior, was jittery and uncooperative. Yet, she adamantly denied using drugs. The doctor had instructed her not to breastfeed, but she did so anyway, stating she was not an addict. Confronted with her test results, she claimed she must have eaten something "laced" with drugs. She admitted using drugs in the past, but denied a current substance abuse problem. She claimed to have no knowledge of how she tested positive for methamphetamine during a 2009 prenatal appointment when she was previously pregnant. And she refused to acknowledge that pregnancy (which had eventually resulted in a miscarriage), instead stating that " 'something came out of her.' "

Mother identified N.V.'s father as "Dean," but she had no other information about him since they had " 'a onetime thing.' "

Mother reported she also had twin 15-year-old boys, who were currently "visiting" their father. She claimed to have no knowledge of how to contact the father and her sons. When DHHS contacted them, one of the sons reported that they had lived with father for

2

about a year, that mother would occasionally come by and pound on the door (sometimes for hours), yelling and cursing, and demanding the twins be released to her. The police were sometimes called. The son had not witnessed mother doing drugs but described her as a " 'tweeker' " and reported having seen her pour herself a small amount of beer when she was pregnant, saying it would not hurt the baby, and then go on to drink a whole six pack of beer. Mother's other son, who was described as much more guarded and protective, denied witnessing mother using drugs or consuming alcohol.

At the October 28, 2014, detention hearing, the juvenile court ordered services be provided to mother. A combined jurisdiction/disposition hearing was scheduled for November 18, 2014.

On November 18, 2014, mother appeared in court. DHHS requested a continuance because the minor had been hospitalized with a 102 degree fever. A doctor reported that such a fever is a common symptom of "drug exposed babies."

By the December 2014, when the social worker spoke to mother in preparation for the jurisdiction/disposition report, mother admitted she used methamphetamine and amphetamine, but claimed it was only on one occasion -- two days before the minor was born. Mother said she made a mistake and added, " 'My baby was healthy when he was born.' " She refused to discuss whether she had breastfed the minor against medical advice.

Mother denied having a history of excessive use of alcohol or that she drank regularly after becoming pregnant, and continued to deny that alcohol was an issue for her. Mother has a 2008 conviction for misdemeanor vandalism and 2012 misdemeanor convictions stemming for driving under the influence (DUI) and driving with a suspended license. She told the social worker she had first tried alcohol when she was 21 years old, had consumed alcohol only three to four times in her life, and that one of the those times was the time she got the DUI. She claimed that was " 'the last time' " she consumed an excess amount of alcohol.

Mother had completed an alcohol and drug assessment through Specialized Treatment and Recovery Specialist (STARS). She had also been authorized to receive treatment from Bridges, an outpatient program.

On October 24, 2014, mother enrolled for drug testing with Strategies for Change, and then began drug testing and participating in individual and group counseling through Bridges. Mother also had started attending Narcotics Anonymous and Alcoholics Anonymous meetings (NA/AA), and she provided an attendance report that showed she had participated in 21 meetings between October 31 and November 29, 2014.

The social worker spoke to mother's STARS "recovery specialist" Vernita Coleman, on December 1, 2014. Coleman reported that mother was compliant with all her services and indicated she had no concerns. Mother had tested negatively for all substances 11 times between October 31 and December 1, 2014.

However, mother tested positive for alcohol on November 19, and admitted to Coleman she consumed alcohol. Mother told the social worker she had consumed a "small can" of beer on November 18. As we have noted, that day was the day mother was present in court and the court was informed the minor had been hospitalized. Among the dates of the NA/AA meetings mother had attended were November 17 and 18, 2014. She had also attended group counseling at Bridges on November 17, 2014.

### The Jurisdiction/Disposition Hearing

On January 26, 2015, the contested jurisdiction/disposition hearing was held, and Coleman was called by mother to testify. As a recovery specialist, Coleman monitored mother's progress with counseling and testing. Mother was required to participate in treatment, randomly test for drugs twice a week, and submit to Breathalyzer testing every time she had contact with her recovery specialist. Coleman met with mother two or three times a week, and mother was "Breathalyzed" each time. Mother had been compliant throughout that time, except for the two-week period from November 16-30, when

4

mother produced a positive test for alcohol. Mother reported to Coleman that she "had one drink and that she doesn't drink."

The positive alcohol test was a urinalysis test that had been sent out to the lab for an ethyl glucuronide (EtG) test. The Breathalyzer test performed the same day the urine sample was given came back at "zero." The "EtG report came back at 10,000 units greater than," which, according to Coleman, meant mother had had "an extensive amount of alcohol maybe." When asked whether that was consistent with having one drink, Coleman responded, "Maybe not." In response to the juvenile court's inquiry, Coleman indicated that she could not compare the results of the EtG test "in terms of a standard test result for a DUI" such as a ".02 or a .03" or "a .10 or a .08." Although unable to indicate "down to a science" what a test result of 10,000 units is equivalent to in terms of the amount of alcohol consumed, Coleman stated that it was within her training and understanding that "it's more than a can of beer."

Coleman had never asked mother how many times she used methamphetamine and did not know mother had told DHHS she had only used the drug once. That was inconsistent with the information Coleman had.

Mother testified at the hearing. She explained that the Bridges outpatient program consisted of parenting classes, drug education, and the effects and side effects of drug use. She attended four hours per day, for substance abuse and parenting, and attended NA meetings at night. She had a sponsor and was on the eighth of 12 steps. She intended to continue attending her support groups and NA classes, and do whatever it took to get the minor back in her custody.

When asked about her positive test for methamphetamine at the time of the minor's birth, mother stated: "Yes, because I used like two days before he was born like an idiot. The whole time I was clean, and for some stupid reason I made a wrong choice that day . . . ." She said she did not know how many times she had used

5

methamphetamine but that, "yeah, it wasn't no one time. I've done meth a few times and that was it."

When asked why she had drank the night before the positive EtG test, mother stated: "I don't know. I just drank one can of beer. I just felt like drinking one can of beer." When asked what type of alcohol she usually drinks, she said she drank Budweiser in a can. When asked how many she usually drinks at a time, she replied, "Well, that day was just one. But usually I will probably drink like two, but that would be it." When confronted with Coleman's testimony that the EtG results indicated it was more than one drink, mother responded that Coleman was not a toxicologist and insisted that she had consumed only one small can of Budweiser. When asked about her son's statement that he saw her drink while she was pregnant, she said he was lying. The juvenile court asked mother how much she drank before she got her DUI and she stated she drank a six-pack and it was a one-time thing. She said she had used alcohol before, when she was 21, drinking a beer "here or there," but nothing like the day she got pulled over.

In contrast with mother's earlier statements about her sons and their father, mother testified that the boys had been living with their father for the past several months or a year. She had been visiting them at their father's home and spending the night. Prior to the dependency case, she saw those sons regularly, and she called them frequently.

Mother believed the substance abuse testing and treatment was helping her and that she was capable of caring for and protecting the minor. She requested that the petition be dismissed and objected to the juvenile court asserting jurisdiction based on a failure of proof by DHHS. The juvenile court found mother was not being candid about her drug or alcohol use, despite her participation in treatment. It found the allegations in the petition true, adjudged the minor a dependent child of the court, removed him from mother's custody, and ordered reunification services for mother.

# DISCUSSION

## I. Consideration of Extraneous Evidence

In making its ruling at the jurisdiction/disposition hearing, the juvenile court found that "instead of learning something during these weeks of treatment, [mother was] still being dishonest." In finding her to be dishonest, the juvenile court noted it had observed her demeanor and also found she had been dishonest in her testimony that she had only a single beer on November 18, 2014.

Mother contends the juvenile court came to this conclusion based on its improper consideration of extraneous evidence, citing to the following comments made by the court when it made its ruling:

"I noticed that the answer to the alcohol test by your client was, 'Well, they're not an expert in toxicology.' I'm not a toxicologist either, but for the record, . . . I have done years of drug court before I retired in Yolo County. I have done dependency drug court. I have done drug court for juvenile court. So I do have some experience, as well as hearing hundreds of DUI cases. And the answer that a person is not a toxicologist for anyone who has this experience knows that someone is testing in the morning and they drank the night before would be a substantial amount of alcohol. The burn off rate is about [] two per hour. And she still had it in her system in the morning." Mother claims these comments reflect that the juvenile court determined she was being dishonest based on its understanding of blood-alcohol content (BAC) testing, which was extraneous and irrelevant because she had been subjected to an EtG test.

We first note that, "as a general rule, 'the failure to object to errors committed at trial relieves the reviewing court of the obligation to consider those errors on appeal.' [Citations.] This [rule] applies to claims based on statutory violations, as well as claims based on violations of fundamental constitutional rights." (*In re Seaton* (2004) 34 Cal.4th 193, 198; see also *People v. Nelson* (2012) 209 Cal.App.4th 698, 711 [failure to object to improper admission of evidence forfeits issue on appeal]; *People v. Scott*

7

(1994) 9 Cal.4th 331, 356 [claim based on the trial court's articulated reasoning for exercising its sentencing discretion forfeited for failure to object].) At the time the juvenile court made its ruling, mother made no objection to the court using its experience in DUI cases and its understanding of BAC testing. Mother did not request to reopen the evidentiary portion of the hearing to introduce evidence that BAC and EtG testing are different and provide different information, or to explain the meaning of her EtG test result.[2] Her failure to object prevented the juvenile court from remedying any error or clarifying the extent to which it was considering its experience with BAC testing in reaching its decision in this case. Thus, mother forfeited the contention she now asserts on appeal.

In any event, even if the juvenile court improperly considered extraneous BAC-based information it obtained from outside sources in determining mother lied about having only consumed a single beer that night, that error was harmless. It was clear from other evidence, specifically, the testimony of mother's counselor, that mother was lying when she claimed she had consumed only a single beer.

Furthermore, the juvenile court's finding that mother lacked credibility and was being dishonest about her substance abuse was also based on mother's other various explanations of her drug and alcohol use. As noted by the juvenile court, mother initially denied having used methamphetamine during her pregnancy. When confronted in the hospital with the positive methamphetamine drug test, she denied using

---

[2] We decline to accept mother's offer of additional evidence regarding alcohol biomarkers, including EtG biomarker testing, which she attached to her opening brief as an exhibit. By submitting such extraneous evidence for consideration, she requests this court do precisely what she is complaining the juvenile court did in error. Furthermore, we find it bewildering that she requests we consider the documentation because it indicates that a " 'high' " positive, which may indicate *heavy* drinking the same day or the previous day or two, is a result of over 1,000 ng/ml, and mother's witness testified mother's result was over *10,000* units.

methamphetamine and made up a story that she must have eaten something "laced" with drugs. She went ahead and breastfed, against medical advice, insisting that she did not use drugs.

When confronted by the social worker about her methamphetamine use during her pregnancy with the minor, mother changed her story and reported she had only used methamphetamine one time, and that was two days before the minor was born. It was only *after* her counselor contradicted that information at trial that mother confessed, "I don't know if I told [the social worker] that. But, yeah, it wasn't no one time. I've done meth a few times and that was it." Yet she continued to deny knowing how she tested positive for methamphetamine during her previous pregnancy.

Mother's acknowledgement of her alcohol use has also been disingenuous. Her claim that she consumed a single beer the night before her EtG test result of over 10,000 units is implausible, even to her own counselor. Further, the court would have been justified in concluding that it was unlikely that a person who was purportedly a non-drinker, would have been unable to resist drinking any amount of beer when she knew she was being monitored. Moreover, mother's statements regarding her prior beer drinking were inconsistent. She told the social worker she had consumed alcohol only three to four times in her life, and that one of those times was the time she got the DUI. Yet, during her testimony at the hearing, she stated that she drank alcohol when she was 21, drinking a beer "here or there," that her alcoholic beverage of choice is Budweiser beer in the can, and that she "usually" had two cans when she drinks. Confronted with her son's statement that he had seen her drink a six-pack while she was pregnant, she dismissively claimed he was lying. The juvenile court expressly indicated it "observed the demeanor here, and I think this goes well more than a lack of awareness. I think it goes to dishonesty."

Issues of credibility and the weighing of mother's episodes of dishonesty are within the province of the juvenile court. (*In re Christina T.* (1986) 184 Cal.App.3d 630,

9

638-639.) The juvenile court's determination that mother was continuing to be dishonest did not turn, as mother alleges, on its knowledge and consideration of BAC test results. It was based on the implausibility of mother's testimony, the testimony of mother's own witness, which also indicated mother was being dishonest about her drinking prior to the positive EtG test, mother's history of dishonesty, and mother's demeanor while testifying. Consequently, it is not reasonably probable that mother would have obtained a more favorable result even if the court had not considered the extraneous information. (*People v. Watson* (1956) 46 Cal.2d 818, 836; cf. *People v. Zambrano* (2004) 124 Cal.App.4th 228, 243 [defendant's explanation of the events was patently unreasonable and even if the prosecutor had not committed misconduct in cross-examination and closing argument, it is not reasonably probable that the jury would have believed defendant's version of events].) Nor can it be said that it is "substantially likely" the juvenile court's consideration of the extraneous evidence resulted in actual harm. (Cf. *In re Carpenter* (1995) 9 Cal.4th 634, 654 [In the context of jury misconduct involving the receipt of extraneous information, the presumption of prejudice is rebutted when an examination of the entire record, including the strength of the evidence against the defendant, shows there is no substantial likelihood that the defendant suffered actual harm.].)

## II. Removal

Mother also contends there was insufficient evidence to support the juvenile court's findings that the minor was at substantial risk of physical harm so as to justify removal from her custody because she contends there were reasonable alternatives to removal. We disagree.

To support an order removing a child from parental custody, the juvenile court must find clear and convincing evidence that "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's

physical health can be protected without removing the minor from the minor's parent's . . . physical custody." (§ 361, subd. (c)(1).) The juvenile court must also "make a determination as to whether reasonable efforts were made to prevent or to eliminate the need for removal of the minor" and "state the facts on which the decision to remove the minor is based." (§ 361, subd. (d).)

" 'The jurisdictional findings are prima facie evidence that the child cannot safely remain in the home. [Citation.]' [Citation.] ' "The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child." [Citation.] The court may consider a parent's past conduct as well as present circumstances. [Citation.]' [Citation.] We review a dispositional order removing a child from parental custody for substantial evidence." (*In re John M.* (2012) 212 Cal.App.4th 1117, 1126.) The evidence is considered "in the light most favorable to the prevailing party, giving the prevailing party the benefit of every reasonable inference and resolving all conflicts in support of the order. [Citations.]" (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 576.)

Prenatal use of a dangerous drug is probative of future child neglect, as demonstrated by mother's own behavior here. (*In re Troy D.* (1989) 215 Cal.App.3d 889, 899.) Not only did mother use methamphetamine just days before the minor's birth, she breastfed the minor against medical advice and *refused to desist* in doing so. The minor suffered by testing positive for amphetamine and methamphetamine at birth, and showing symptoms consistent with drug exposure shortly thereafter. Mother drank large amounts of alcohol during her pregnancy, and continued to drink alcohol, even after the minor was detained and she was in a substance abuse treatment program. Indeed, the evidence shows mother went to both group counselling at Bridges and an NA/AA meeting the day before she drank beer and went to NA/AA the same day she had the beer.

11

The juvenile court found mother had failed to learn during the previous months of treatment and was still being dishonest about her substance abuse. It was absolutely appropriate for the juvenile court to consider mother's denials when determining the risk to the minor if placed with her. (See *In re Esmeralda B.* (1992) 11 Cal.App.4th 1036, 1044.) Mother cannot be expected to modify her behavior if she remains in denial. (*Ibid.*) The juvenile court reasonably concluded that mother's denial of her substance abuse problem reflected an underlying resistance to the treatment needed to effect the behavior changes that would ensure the minor's safety.

Mother argues that the juvenile court could have put safeguards into place, such as requiring mother to complete random drug and alcohol testing and unannounced visits by the DHHS to the home, as a reasonable means to protect the minor without removing him from mother's custody. Such measures would not adequately protect the minor.

Mother had already established that she was unable to refrain from alcohol use for the brief two and a half month period prior to the disposition hearing, even while in treatment and being subject to random testing. She had proven that she was unwilling to follow medical advice with respect to the care of the minor, and was willing to continue to expose the minor to dangerous substances, even while being monitored by physicians. Mother's continued dishonesty and refusal to acknowledge her past substance abuse indicates she is unable to control it and would likely continue to place the minor at risk.

Unannounced visits can only assess the situation and mother's sobriety at the time of the visit. Substance abuse testing can only detect use after the fact -- which would be *after* mother had already placed the minor at risk again. Given mother's inability to refrain from alcohol use despite random testing, coupled with her dishonesty, which reflects her refusal to acknowledge her problem and its potential effect on the minor, there was no way to guarantee the minor's physical health, well-being and protection while living with mother. There are no reasonable alternatives to removal. Until mother can establish she can benefit from the provision of services, there is ample evidence the

12

minor's physical health, safety, protection, and well-being would be in serious jeopardy if he were returned to her custody.

## DISPOSITION

The judgment is affirmed.


       MURRAY       , J.


We concur:


     BLEASE      , Acting P. J.


     ROBIE      , J.