[No. D008442. Fourth Dist., Div. One. Nov. 15, 1989.]

In re TROY D., a Minor.
SAN DIEGO COUNTY DEPARTMENT OF SOCIAL SERVICES,
Petitioner and Respondent, v.
KELLY D., Objector and Appellant.

## COUNSEL

James G. Dunn, under appointment by the Court of Appeal, for Objector and Appellant.

Edwin L. Miller, Jr., District Attorney, Peter C. Lehman and Edward J. Mantyla, Deputy District Attorneys, for Petitioner and Respondent.

Sherri Sobel Sokoloff, under appointment by the Court of Appeal, for Minor.

## OPINION

**FROEHLICH, J.**—Troy D. was declared a dependent child of the juvenile court under former section 300(a)[1] of the Welfare and Institutions Code[2] on

---

[1] Former section 300(a) states: "Any person under the age of 18 years who comes within any of the following descriptions is within the jurisdiction of the juvenile court which may adjudge that person to be a dependent child of the court:

"(a) Who is in need of proper and effective parental care or control and has no parent or guardian, or has no parent or guardian willing to exercise or capable of exercising care or control, or has no parent, guardian, or custodian actually exercising care or control."

A new section 300(a) took effect January 1, 1989. It states that a child may come within the court's jurisdiction if "[t]he minor has suffered, or there is a substantial risk that the minor will suffer, serious physical harm inflicted nonaccidentally upon the minor by the minor's parent or guardian. For the purposes of this subdivision, a court may find there is a substantial risk of serious future injury based on the manner in which a less serious injury was inflicted, a history of repeated inflictions of injuries on the minor or the minor's siblings, or a combination of these and other actions by the parent or guardian which indicate the child is at risk of serious physical harm. . . ."

We make no determination whether the foregoing analysis is applicable to the new wording of the statute.

[2] All statutory references are to the Welfare and Institutions Code unless otherwise specified. When referring to statutory subparts we omit repetition of the word "subdivision."

the basis of a petition which alleged that he was born under the influence of morphine, methamphetamine and amphetamine, and that his parents were unable to protect him. He was placed in his paternal grandmother's custody. Troy's mother, Kelly D. (Mother) appeals.

### FACTUAL AND PROCEDURAL BACKGROUND

Troy was born prematurely on February 10, 1988. Tests taken on Troy and Mother at the time of Troy's birth were positive for amphetamines and opiates.[3] On February 16, 1988, a petition was filed alleging that Troy came within the provisions of section 300(a) in that his "mother used narcotics and dangerous drugs, to wit, codeine and methamphetamine, to excess to the detriment of said minor, and the father was unable to protect said minor."

At a detention hearing on February 17, the court detained Troy from residing in his parents' home. At a readiness hearing on March 16, the court changed Troy's placement to his parents' home and conditioned this placement on his parents continuing to be tested for drugs and attending parenting classes.

On March 25 an amended petition was filed alleging that Troy came within the provisions of section 300(a) in that he "was diagnosed as being born under the influence of a narcotic and/or dangerous drugs, to wit, morphine, methamphetamine and amphetamine, and the parents were unable to protect said minor, and the minor is in need of the protection of the Juvenile Court."

At an April 19 hearing Mother's demurrer to the amended petition was overruled. At a hearing on April 21 the court changed Troy's placement, ordering him detained with his grandmother.

On May 18 the court found the amended petition true, and on June 14 took custody from the parents under section 361(b) and Civil Code section 4600, placing Troy with his grandmother, who was residing at his parents' home. The court ordered that "any unsupervised time between the parents and minor may occur only with the agreement of the social worker." It further ordered that the parents submit to psychological evaluation and

---

[3] Urine toxicology screen tests were performed on Troy at the Tri-City Hospital Medical Center Laboratory on February 10 and 11, 1988. The February 10 test reported positive results for opiates and amphetamines. The February 11 test was positive for amphetamines and opiates. Mother's toxicology screen on February 10 also reported positive results for opiates and amphetamines.

participate in parenting classes and drug rehabilitation, including drug testing.

## CONTENTIONS

Mother appeals, contending her demurrer to the petition alleging that Troy was born under the influence of dangerous drugs should have been sustained. She also asserts that the court should have sustained her objections to the introduction into evidence of her and her son's medical records because such introduction was a violation of the Confidentiality of Medical Information Act and of the physician-patient privilege. She further asserts the medical records are hearsay. In addition, she maintains that insufficient evidence was introduced to justify sustaining the allegations of the amended petition. We shall affirm.

## DISCUSSION

### A

▉▉▉ Mother first contends her demurrer to the amended petition should have been sustained. She argues that even if there were sufficient admissible evidence to sustain the allegation that Troy was born under the influence of dangerous drugs, such fact would be an insufficient legal showing for the juvenile court to exercise jurisdiction.

▉▉▉ Although we have found no statute specifically authorizing a demurrer in the context of a dependency proceeding, due process requires that the parents be given constitutionally adequate notice of allegations which may result in the court asserting jurisdiction. As one court has observed, since there must be a means of testing the adequacy of notice in the petition's allegations, "the juvenile court has inherent power to entertain a prehearing challenge to the petition's sufficiency by a motion akin to a demurrer. The parties should have an opportunity to test the sufficiency in the trial court, rather than reserving that question for the Court of Appeal." (*In re Fred J.* (1979) 89 Cal.App.3d 168, 176 [152 Cal.Rptr. 327].)[4]

▉▉▉ An order overruling a demurrer is not an appealable order, (see 9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 82, pp. 104-105; *Harmon v. De Turk* (1917) 176 Cal. 758, 761 [169 P. 680]), but may be reviewed on an

---

[4]The *Fred J.* court noted that in characterizing the motion as "akin to a demurrer," they did not mean to imply that all of the provisions of Code of Civil Procedure section 430.10 are appropriate to the dependency process, but only that the challenge is available to test the sufficiency of the petition to invoke the court's jurisdiction. (*In re Fred J., supra*, at p. 176, fn. 4.) We agree with this observation.

appeal from the judgment itself. (*Adams* v. *Christopher* (1931) 112 Cal.App. 37, 39 [296 P. 85].) ██ ██ In reviewing the court's ruling on Mother's prehearing challenge to the petition's sufficiency, we hold her challenge to the amended petition was correctly overruled.[5]

 The fact that Troy was diagnosed as being born under the influence of a dangerous drug is legally sufficient for the juvenile court to exercise jurisdiction. Section 355.1(a) provides: "Where the court finds, based upon competent professional evidence, that an injury, injuries, or detrimental condition sustained by a minor of such a nature as would ordinarily not be sustained except as the result of the unreasonable or neglectful acts or omissions of either parent, the guardian, or other person who has the care or custody of the minor, that evidence shall be prima facie evidence that the minor is a person described by subdivision (a), (b), or (d) of Section 300."

Troy was born with a detrimental condition caused by Mother's unreasonable acts of ingesting dangerous drugs while pregnant with him. This fact created a legal presumption that he is a person described by section 300(a). Mother has not presented sufficient evidence to rebut this presumption.

 Mother argues that it is improper to sustain jurisdiction on the basis of the petition because it involves conduct with respect to a fetus, not with respect to a child. We disagree with this argument.

Although, as Mother points out, a dependency petition cannot be sustained with respect to a fetus (*In re Steven S.* (1981) 126 Cal.App.3d 23 [178

---

[5] The concurring opinion suggests that we need not now address the merits of the demurrer, since facts adduced at the jurisdictional hearing provided ample grounds for removing the child from his parents' custody. Since the trial court was not required to rely solely on the evidence of the child's pre-birth exposure to dangerous drugs, the fact that the allegation of the petition was so limited becomes, it is argued, immaterial. We respectfully do not subscribe to the concurring justice's view of the mooting of an erroneous denial of a demurrer by virtue of subsequently admitted evidence at the time of trial. The concurring opinion relies on *Ades* v. *Brush* (1944) 66 Cal.App.2d 436, 444 [152 P.2d 519], a case in which the defect in the complaint was remedied (after erroneous denial of a demurrer) by allegations in the answer giving focus to the issue omitted in the complaint. As indicated in 9 Witkin, California Procedure (3d ed. 1985) Appeal, section 345, pages 349-350, a defect or omission in the complaint (which should have resulted in the sustaining of a demurrer erroneously overruled) can be cured by the defendant's own subsequent pleading which raises the otherwise missing allegations. Also, as stated by Witkin, technical defects such as misjoinder, uncertainty, conclusory allegations, etc., can be cured by going to trial on the merits. (*Id.* at p. 350, § 345.) The appellant in this case did nothing by way of pleading to cure any defect in the petition. Further, the defect, if it existed, was by no means technical or minor such that it could be deemed cured by the proof at time of trial. Our review of the record indicates that although the trial judge did receive and consider evidence in addition to the evidence of pre-birth exposure to drugs, the fetal exposure continued throughout the hearing to constitute the paramount motivating factor to the decision. Were we to find the overruling of the demurrer to have been in error, we believe we would be obliged to reverse the court's decision.

Cal.Rptr. 525]), Troy is not a fetus but a living child born with dangerous drugs in his body because his mother used the drugs while pregnant with him. The petition was concerned with the protection of a living child, not with a fetus as in the case of *Steven S.*

The severe problem of babies born under the influence of dangerous drugs due to their mothers' use of such drugs during pregnancy has reached great proportions. It has been estimated that 11 percent of children born in United States hospitals are born having been exposed to dangerous drugs and are consequently at risk. (See Cal. Sen. Office of Research, Drug-Exposed Infants—Summary of Related Legislation (Oct. 19, 1989) p. 1.)[6] To enable juvenile courts to protect drug-exposed infants and to compel parents to undergo drug rehabilitation therapy and to afford child protection services to the family, courts must be able to assert jurisdiction over infants born at risk because of prenatal exposure to dangerous drugs.

A fetus is accorded variable legal treatment due to social policies underlying different areas of the law. For example, an unborn fetus is not consid-

---

[6] A statewide task force, appointed by the California State Senate Select Committee on Children and Youth, in conjunction with the State Assembly on Health and Human Services, and the State Senate Office of Research, has been meeting since March 1989 to develop recommendations of ways to deal with drug-exposed infants. (See Cal. Sen. Office of Research, Drug-Exposed Infants—Summary of Related Legislation, *supra,* p. 1.)

There are a number of bills dealing with the problem now pending before the California Legislature which would provide prevention and intervention services to mothers and children affected by drugs and would make some change in dependency law as it relates to substance abuse. Assembly Bill No. 741 proposes the Alcohol and Drug Affected Infants Act of 1989, which would provide service and treatment for increased maternal substance abuse, residential programs for pregnant women, training for providers of prenatal care, and a coordinated state and county service plan for women at risk. (*Id.* at p. 3.) Assembly Bill No. 857 would require health practitioners to report when a child is born with detectable traces of a drug in his or her system. (*Ibid.*) Among the provisions of Senate Bill No. 1465, which deals with alcohol and drug abuse treatment for women, is a provision which would prevent removing a child from his or her parents' custody solely on the basis of a positive toxicology test and instead direct the court to consider the test results in relation to the ability of the parent to care for the child. That same bill would permit prosecution of a woman for manslaughter if she used controlled substances on a regular basis during pregnancy, refused available services or failed to complete a drug treatment program, and her child was born alive and subsequently died due to drug exposure. (*Id.* at p. 2.) Assembly Bill No. 1762 would require that the inability of a parent to care for a child because of substance abuse be considered prima facie grounds for declaring the child a dependent of the court. (*Id.* at p. 5.)

In a letter to the editor of the Los Angeles Times, United States Senator Pete Wilson (R-Cal.) reports that he has introduced legislation in the United States Senate which would create The Child Abuse During Pregnancy Prevention Act, providing five $10 million grants to states to set up comprehensive programs for the prevention of alcohol abuse and illegal drug use by pregnant women. Among its provisions, the act would offer grants to states which provide mandatory rehabilitation to substance abusing mothers and afford a mother undergoing such rehabilitation the opportunity to keep her baby. (Los Angeles Times (Aug. 23, 1989) at Metro, pt. 2, p. 6, col. 6.)

ered to be a child within California's felony child abuse statute, Penal Code section 273a. (*Reyes* v. *Superior Court* (1977) 75 Cal.App.3d 214, 219 [141 Cal.Rptr. 912].) As stated above, according to California law, a dependency petition cannot be sustained with respect to a fetus. (*In re Steven S., supra,* 126 Cal.App.3d 23.) A stillborn fetus is not considered a person within the wrongful death statute in California (*Justus* v. *Atchison* (1977) 19 Cal.3d 564, 579 [141 Cal.Rptr. 912]), although the majority of states follow the contrary rule. (Nelson, Buggy & Weil, *Forced Medical Treatment of Pregnant Women: 'Compelling Each to Live as Seems Good to the Rest'* (1986) 37 Hastings L.J. 703, 737.) Although the fetus does not enjoy the same legal status as a child in every context, a living child must be afforded the protection of the juvenile court even though he is at risk because of his mother's actions before his birth.

Since no California court has specifically answered the question of whether dependency jurisdiction may be assumed solely on the basis of an allegation that an infant is born under the influence of dangerous drugs,[7] we looked to other states for guidance. In so doing, we found only one case which dealt squarely with the issue. In *Matter of Baby X* (Mich.App. 1980) 293 N.W.2d 736, a Michigan appellate court held that a court may assert jurisdiction over a baby born with drug withdrawal symptoms caused by his mother's prenatal drug addiction. (*Id.* at p. 739.) The *Baby X* court rejected the mother's assertion that prenatal conduct cannot constitute neglect or abuse, reasoning that "[s]ince prior treatment of one child can support neglect allegations regarding another child, . . . prenatal treatment can be considered probative of a child's neglect as well." (*Ibid.*) The court went on to state, however, that it made no determination whether prenatal drug use by the mother would alone be enough permanently to deprive a parent of custody. (*Ibid.*)

We agree that prenatal use of dangerous drugs by a mother is probative of future child neglect. As the trial court said in overruling the demurrer, "the care of a minor to me includes anticipatory actions," and "[the

---

[7]California courts have looked at prenatal drug abuse as one of the factors to consider in determining child dependency. (See *In re Paula P.* (1981) 123 Cal.App.3d 734, 748 [176 Cal.Rptr. 708] [a dependency petition was sustained on the basis that the parents failed to provide proper and effective parental care or control, failed to provide a home, and allowed child to be born addicted to heroin]; *In re Solomon L.* (1987) 190 Cal.App.3d 1106, 1112-1113 [236 Cal.Rptr. 2] [the fact that the mother took drugs while she was pregnant, knowing them to be harmful to her unborn child, was one of the factors constituting neglect under Civil Code section 232, subdivision (a)(2), declaring the child free from his parents' custody and control]; *In re Amos L.* (1981) 124 Cal.App.3d 1031, 1037 [177 Cal.Rptr. 783] [the appeal court affirmed a jurisdictional finding on the basis that the mother utilized drugs during pregnancy, posing a potential hazard to the minor, and that the minor was injured when his mother left him in the care of an individual who was under the influence of alcohol.])

petition] indicates that the mother conducted herself in a manner that was dangerous to the child prior to the child's birth but with full knowledge the child would be born." Mother's prenatal drug use indicated that Troy was at risk and in need of the court's protection.

While jurisdiction must be asserted on the basis of conditions which exist at the time of the jurisdictional hearing, the court is not required to disregard the mother's prior conduct. (*In re Robert P.* (1976) 61 Cal.App.3d 310, 316-317 [132 Cal.Rptr. 5].) "[P]ast events can aid in a determination of present unfitness." (*In re Melissa H.* (1974) 38 Cal.App.3d 173, 175 [113 Cal.Rptr. 139].) Although we recognize that the cases just cited deal with prior conduct with a living child, rather than a fetus, we believe the same reasoning is applicable. Mother's conduct prior to Troy's birth was sufficient to establish the court's jurisdiction.

The trial court correctly overruled Mother's demurrer.

## B

Mother next asserts that the trial court should have sustained her objections to placing her and Troy's medical records into evidence. She argues disclosure of medical records is a violation of the Confidentiality of Medical Information Act (Civ. Code, § 56 et seq.) and a violation of the physician-patient privilege. She also claims the medical records are hearsay.

Preliminarily, we observe that we are concerned about applying a physician-patient privilege to Mother regarding Troy's medical records. Under ordinary circumstances, it would be reasonable for a parent to be able to assert the privilege on behalf of his child. Evidence Code section 993, subdivisions (a) and (b) provide that the holder of the physician-patient privilege is "(a) [t]he patient when he has no guardian or conservator" or "(b) [a] guardian or conservator of the patient when the patient has a guardian or conservator." But we question the appropriateness of Mother asserting a privilege to prevent the disclosure of Troy's medical records during his dependency hearing when his and her interests are potentially conflicting. The physician-patient privilege is entirely statutory, and its purpose is to encourage the patient to be free in disclosing facts about his illness to enable the physician to treat the illness or maintain the patient's general health. (See 2 Witkin, Cal. Evidence (3d ed. 1986) Witnesses, §§ 1188-1189, pp. 1131-1132.) "The rules of privilege are designed to protect personal relationships and other interests where public policy deems them more important than the need for evidence." (*Koshman* v. *Superior Court* (1980) 111 Cal.App.3d 294, 297 [168 Cal.Rptr. 558].) We see no legitimate public policy being served by allowing

Mother to prevent disclosure of Troy's medical records. Troy was represented by counsel at the jurisdictional hearing, and his attorney made no objection to admitting his medical records.[8]

■ Even assuming that Mother held a privilege to prevent the disclosure of Troy's medical records, the trial court correctly overruled her objections.

Mother's acts of ingesting dangerous drugs while pregnant resulted in injury to Troy, evidenced by the fact that he was born under the influence of dangerous drugs. Pursuant to Penal Code section 11166, if the hospital social worker concluded that Troy's positive toxicology test results raised a reasonable suspicion of child abuse, the hospital was required to report that fact to a child protective agency.[9] Civil Code section 56.10, subdivision (b)(7) states: "A provider of health care shall disclose medical information if the disclosure is . . . [¶] otherwise specifically required by law." Penal Code section 11171, subdivision (b) states: "Neither the physician-patient privilege nor the psychotherapist-patient privilege applies to information reported pursuant to this article in any court proceeding or administrative hearing." When a hospital social worker makes a risk assessment of a newborn's situation and concludes there is a reasonable suspicion of child abuse, under Penal Code section 11166, the social worker must report to a child protective agency. Here, the social worker made the discretionary decision that child abuse existed.[10] Accordingly, there was no violation of the act or the physician-patient privilege based on the reporting mandate in Penal Code section 11166, subdivision (a).

---

[8] See *In re Fred J., supra,* 89 Cal.App.3d at pages 178-179, in which the court expressed extreme doubt that a mother was the holder of a privilege to prevent two psychiatrists from testifying about the results of examining her two children.

[9] Penal Code section 11166, subdivision (a) states in pertinent part: "Except as provided in subdivision (b), any child care custodian, health practitioner, or employee of a child protective agency who has knowledge of or observes a child in his or her professional capacity or within the scope of his or her employment whom he or she knows or reasonably suspects has been the victim of child abuse shall report the known or suspected instance of child abuse to a child protective agency immediately or as soon as practically possible . . . . For the purposes of this article, 'reasonable suspicion' means that it is objectively reasonable for a person to entertain such a suspicion, based upon facts that could cause a reasonable person in a like position, drawing when appropriate on his or her training and experience, to suspect child abuse."

[10] Our analysis does not suggest that there is a violation of Penal Code section 11166 if a hospital social worker determines in a particular case that a positive toxicology test does not raise a reasonable suspicion of child abuse. This case does not involve, nor do we address, the issue of whether, or under what circumstances, a health care provider is required under Penal Code section 11166, subdivision (a) to report suspected child abuse in the context of newborn toxicology screening. Our holding is confined to our conclusion that there was no violation of the Confidentiality of Medical Information Act or of the physician-patient privilege by the hospital social worker's discretionary decision to report the positive test results and for those results to be introduced at a juvenile court hearing.

Mother's reliance on *Koshman* v. *Superior Court, supra,* 111 Cal.App.3d 294 is misplaced. In *Koshman* the parents were involved in a dispute over the custody of their children, and, unlike the situation here, the mother's physician-patient privilege was not subject to any statutory exception. (*Id.* at p. 298.)[11]

Mother argues the reporting requirement under Penal Code section 11166, subdivision (a) does not apply because her act of ingesting drugs prior to Troy's birth does not constitute child abuse. (See *Reyes* v. *Superior Court, supra,* 75 Cal.App.3d 214 (an unborn fetus is not a child within California's felony child abuse statute, Pen. Code, § 273a].) Here, however, the case does not involve an unborn fetus, but a child born under the influence of a dangerous drug. Although Mother's actions took place before Troy was born, her prenatal drug use caused injury to a living child. Thus, the requirements of Penal Code section 11166, subdivision (a) apply once a hospital social worker makes a discretionary decision of suspected child abuse. Since the case involves a newborn child, there is no issue of so-called "fetal child abuse."[12]

Mother also maintains that her hearsay objections to the introduction of medical records should have been sustained. She claims proponents of the medical records evidence failed to lay an adequate foundation for admission of the medical records within the business records exception to the hearsay rule. This contention also is unmeritorious.

The trial court holds wide discretion to determine whether evidence is admissible, and such a determination will not be disturbed unless there is a clear showing that the court has abused its discretion. (*County of Sonoma* v. *Grant W.* (1986) 187 Cal.App.3d 1439, 1448 [232 Cal.Rptr. 471].) Determining whether a proper foundation has been laid for the admission of business records under Evidence Code section 1271 is within the trial court's discretion and "will not be disturbed on appeal absent a showing of abuse." (*Id.* at p. 1450.)

The medical records were admissible under the business records exception to the hearsay rule. (Evid. Code, § 1271.) When presenting the medical records for admission into evidence the department of social

---

[11] While holding that the mother could prevent the disclosure of her medical records, the *Koshman* court suggested that perhaps a further exception to the patient-physician privilege should be considered by the Legislature, since in some cases the best interests of a child in a custody quarrel are not served by the existence of such a privilege. (*Id.* at p. 299, fn. 5.)

[12] We make no ruling whether, as department argues, Mother waived her privilege not to have her medical records disclosed by signing a release at the hospital. The purported release appears not to have been moved into evidence at the juvenile court hearing. We make no determination whether such a release is sufficient to waive a physician-patient privilege.

services complied with the procedure required for a subpoena duces tecum (Evid. Code, §§ 1560-1566), which allows for the admission of business records if accompanied by an authenticating affidavit. The medical records were delivered under seal to the court as required by Evidence Code section 1560,[13] and accompanied by an affidavit as required by Evidence Code section 1561.[14] Because the department of social services complied with these requirements, the medical records were admissible "to the same extent as though the original[s] thereof were offered and the custodian had been present and testified to the matters stated in the affidavit." (Evid. Code, § 1562.)[15] The hospital records were properly admitted.[16]

## C

Mother finally contends that insufficient evidence was introduced to justify sustaining the amended petition. She claims the medical records

---

[13] Evidence Code section 1560, subdivision (b) provides in pertinent part: "[W]hen a subpoena duces tecum is served upon the custodian of records or other qualified witness of a business in an action in which the business is neither a party nor the place where any cause of action is alleged to have arisen, and the subpoena requires the production of all or any part of the records of the business, it is sufficient compliance therewith if the custodian or other qualified witness . . . delivers by mail or otherwise a true, legible, and durable copy of all the records described in the subpoena to the clerk of court or to the judge if there be no clerk or to such other person as described in subdivision (a) of Section 2018 of the Code of Civil Procedure, together with the affidavit described in Section 1561."

[14] Evidence Code section 1561 states in pertinent part: "(a) The records shall be accompanied by the affidavit of the custodian or other qualified witness, stating in substance each of the following:

"(1) The affiant is the duly authorized custodian of the records or other qualified witness and has authority to certify the records.

"(2) The copy is a true copy of all the records described in the subpoena duces tecum, . . .

"(3) The records were prepared by the personnel of the business in the ordinary course of business at or near the time of the act, condition, or event."

[15] The court determined to admit the actual hospital test records, but not corroborative tests done by a laboratory outside of the hospital.

[16] Mother points to comments in Jefferson's California Evidence Bench Book, which discuss a purported conflict between the business records exception and the production of copies of business records by subpoena under Evidence Code sections 1560-1565. There, Justice Jefferson states that Evidence Code section 1561 does not satisfy the business record exception set forth in Evidence Code section 1271 because section 1561 requires the custodian of the record to state in the affidavit that " 'the records were prepared by the personnel of the business in the ordinary course of business at or near the time of the act, condition, or event,' " while section 1271, subdivision (c) requires the custodian or other qualified witness to testify to the " 'mode of preparation' " of the business record so that the judge can find that Evidence Code section 1271, subdivision (d) is satisfied, i.e., that " 'the sources of information and method and time of preparation were such as to indicate its trustworthiness.' " (1Jefferson, Cal. Evidence Bench Book (2d ed. 1982) Business Records, § 4.1, pp. 212-213.)

We decline to hold that Evidence Code section 1561 does not satisfy the business records exception. The Legislature has the prerogative of fashioning exceptions to the hearsay rule. The exception it has provided here does not appear to us to conflict with the requirements of the business records exception.

and accompanying expert medical testimony were insufficient individually and together to establish the jurisdictional allegations. We disagree.

A reviewing court must uphold a juvenile court's findings during a section 300 dependency hearing if they are supported by substantial evidence. (§ 355; *In re Amos L., supra,* 124 Cal.App.3d 1031, 1036.) Here, substantial evidence was presented to support the allegations that Troy was born under the influence of narcotics and/or dangerous drugs and that his parents were unable to protect him. On the day of Troy's birth, a positive toxicology screen showed the presence of amphetamines and opiates in his urine. At the hearing, pediatrician Dr. Suzanne Dixon testified at great length about the harmful effects and potential long-term consequences of prenatal exposure to dangerous drugs. The parents earlier had lost custody of an older child after police found Mother under the influence of a narcotic and took custody of the child. The fact that Troy was born under the influence of drugs shows that the drug problem continued.

Dr. Dixon told about other factors besides the positive urine toxicology screen which indicated Troy was born under the influence of drugs. These included his prematurity and low birth weight, symptoms associated with methamphetamine withdrawal, a longer than normal hospital stay, poor feeding, lethargy, and weight loss. Mother's arguments that there was no showing that Troy actually suffered any harm from drugs are without merit. Dr. Dixon testified extensively about the potential harmful consequences for children who have suffered prenatal drug exposure. Mother's argument that Dr. Dixon's testimony established that a positive toxicology screen does not prove a baby is born under the influence of a dangerous drug is totally unfounded. Dr. Dixon never indicated the tests did not show that Troy was born under the influence of the drug.[17]

Mother's claim that Dr. Dixon conceded it was impossible to determine whether any of Troy's problems were attributable to prematurity instead of

---

[17]None of the statements Mother points to could be interpreted to show that Dr. Dixon was of the opinion that the tests did not show Troy was born under the influence of drugs.

Dr. Dixon stated the test was positive because of "exposure prior to birth to methamphetamine," that morphine was also present and that "the infant received this prior to birth." She explained: "[The positive test] just means that at some time in the relative recent past in the order of the last three to five days the baby was exposed to a significant amount of . . . methamphetamine." She also stated: "The positive tox[icology] screen is only one part of what I would consider a comprehensive assessment of an infant whose parents have used drugs sometime during pregnancy. . . . [¶] So the positive tox[icology] screen, yes, is important to me, and I guess you could label that 'born under the influence.' But I think there is a much broader circle of concern that I have about children exposed throughout gestation—medically and socially—about children who are in families who have some barriers in place to parenting."

to drug exposure is also meritless. Dr. Dixon stated that some of the symptoms associated with babies born under the influence of drugs are clearly distinct although some irritability and feeding problems are also seen in preterm infants. She reported that his feeding pattern was seen as extremely atypical by the doctors and nurses caring for him, and agreed under cross-examination that the feeding pattern was also possibly due to Troy's prematurity. This statement does not indicate that Dr. Dixon thought Troy's problems were possibly a result of his prematurity instead of his prenatal drug exposure.

The evidence was sufficient to justify sustaining the allegations of the amended petition.

### DISPOSITION

The judgment is affirmed.

Kremer, P. J., concurred.

**WORK, J.**, Concurring.—Although I concur with the result reached by the majority, for the following reasons I would have omitted the lengthy exposition of the mother's contention her demurrer should have been sustained. (See maj. opn., *ante*, Discussion, § A.)

Even where demurrers would have been sustained, "[i]t is . . . well settled that the failure of a complaint to state a cause of action is not fatal to a judgment for the plaintiff unless the appellant can show that the error has resulted in miscarriage of justice. Where the parties at the trial treat a certain issue as being involved, and the judgment is based on that issue, it is not a prejudicial error that the complaint defectively alleges, or fails to allege at all, that issue." (*Ades* v. *Brush* (1944) 66 Cal.App.2d 436, 444 [152 P.2d 519], citing *Baker* v. *Miller* (1923) 190 Cal. 263, 267 [212 P. 11], and other decisions.) Thus, no reversible error can be shown on this record where the facts adduced at the jurisdictional hearing establish the mother's postdrug involvement resulted in an older child being declared a dependent child; her failure to comply with court-ordered drug testing and counseling; and her child being burned through her neglect. This history of inability to adequately care for Troy's older sibling and her continued abuse of illegal drugs in conscious disregard of court orders designed to assist her in regaining custody of the other child, even during this pregnancy, amply supports a finding she was not capable of exercising effective care and control. (Former Welf. & Inst. Code, § 300, subd. (a); *In re Melissa H.* (1974) 38 Cal.App.3d 173, 175 [113 Cal.Rptr. 139].)

Without expressing any opinion as to the correctness of the majority's resolution pertaining to the demurrer's sufficiency, I am satisfied it is extraneous to the dispositive issues in this case. Because I perceive it dicta, I do not join in that portion of the opinion, preferring to leave that question to be resolved by the already ongoing legislative process referred to above or on review of a case where the result depends on such a resolution.

Appellant's petition for review by the Supreme Court was denied January 31, 1990. Broussard, J., and Kaufman, J., were of the opinion that the petition should be granted.