Filed 1/25/16  In re Z.C. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

### COURT OF APPEAL, FOURTH APPELLATE DISTRICT

### DIVISION ONE

### STATE OF CALIFORNIA

| | |
|---|---|
| In re Z.C., a Person Coming Under the Juvenile Court Law. | D068123 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | (Super. Ct. No. EJ3888) |
|      Plaintiff and Respondent, | |
|      v. | |
| SHANNAN I. et al., | |
|      Defendants and Appellants. | |

APPEALS from a judgment of the Superior Court of San Diego County, Daniel Lamborn, Judge.  Affirmed.

Marisa L.D. Conroy, under appointment by the Court of Appeal, for Defendant and Appellant, Shannan I.

Elizabeth C. Alexander, under appointment by the Court of Appeal, for Defendant and Appellant, James C.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Lisa Maldonado, Deputy County Counsel, for Plaintiff and Respondent.

Shannan I. (Mother) and James C. (Father) challenge the juvenile court's jurisdictional findings over their daughter, Z.C., under Welfare and Institutions Code section 300, subdivision (b).[1] Mother and Father contend the evidence was insufficient to support the court's finding of dependency and/or a continued risk of harm to Z.C. at the time of the jurisdictional hearing. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

The San Diego County Health and Human Services Agency (the Agency) detained Z.C. in February 2015 when she was about two weeks old. The Agency's petition (as amended) alleges that Z.C. suffered, or there was a substantial risk she would suffer, serious physical harm or illness as a result of a parent's inability to adequately supervise or protect her. (§ 300, subd. (b).) The petition further alleges that around Z.C.'s birth, she tested positive for a dangerous narcotic/opiates, suffered drug withdrawal symptoms requiring her to remain hospitalized for Methadone treatment, Mother admits to being dependent on pain relievers and Vicodin, and Father knew Mother was using drugs during pregnancy but denied Mother abuses prescription drugs.

A contested jurisdiction and disposition hearing was held in April 2015. The court received the Agency's detention report, jurisdiction and disposition report, two addendum

_____

[1]    All further statutory references are to the Welfare and Institutions Code.

2

reports, a social worker's curriculum vitae, stipulated testimony of two social workers, and testimony and evidence presented by Mother. A summary of the evidence received by the juvenile court follows.

Since 2003, Mother had suffered from chronic pain due to various medical conditions. For many years, Mother had worked as a registered nurse in central California, but around 2012, she became disabled and unable to work, apparently due to a spinal condition, neuropathy, and/or back pain. Mother underwent surgery for her pain— a spinal fusion. After the operation, Mother was prescribed Hydrocodone (a narcotic pain medication) with Acetaminophen, offered under the brand name Vicodin (hereinafter, referred to as Vicodin). Mother took Vicodin for about five days, and then she was transferred to "Ultram," another pain medication (generic: Tramadol). She continued using Tramadol for years.

In 2014, Mother discovered she was about 12 weeks pregnant. She was 45 years old, and on a vacation with Father where they were gradually traveling down the coast of California in a recreational vehicle. They were in northern California when she discovered her pregnancy and where Mother had her first of about three prenatal care appointments during her pregnancy. Mother acknowledged she was of "advanced age," and her pain management issues made her pregnancy riskier.

On September 30, 2014, Mother saw Dr. David Crownover at the Community Memorial Health System in Ventura County. According to Dr. Crownover, Mother had shown signs of withdrawal from her medications. Up until then, Mother had been taking Xanax and Effexor for anxiety and Tramadol for pain. Dr. Crownover explained to

3

Mother the "significant" risks to the fetus from her use of Xanax and Tramadol during pregnancy, such as heart valve birth defects. The doctor instructed Mother to wean off of Tramadol and make an appointment with a psychiatrist "ASAP." Mother testified that Dr. Crownover told her it was okay to take Vicodin as a means of weaning off of Tramadol, but he denied making such a recommendation, and his notes from the visit do not reflect any discussion about Vicodin. Mother testified she began taking small, daily doses of Vicodin after her visit with Dr. Crownover, using the leftover pills prescribed to her years earlier.

In November 2014, Mother saw a psychiatrist. The psychiatrist observed Mother's emotions were extreme—"laughing and gigglish" one moment and then immediately "crying and complain[ing] of having multiple psychosocial problems." The doctor further noted Mother was feeling occasionally depressed, had been "under psychiatric care for many years," had been on multiple and numerous medications for her mental conditions, was presently on Effexor, and had poor concentration, insight, and judgment. The doctor diagnosed her with "bipolar disorder, mixed," and he added Klonopin to her prescribed medications.

Mother became very sick during the last trimester of her pregnancy, and could not eat much. In January 2015, she visited the emergency room (ER) in Chula Vista. Despite Dr. Crownover's specific warnings against taking Xanax, Mother's urine tested positive for it (and other drugs) during her hospital visit. Mother expressed concern to an ER doctor about experiencing withdrawal from Klonopin. When she was denied a refill due to the ER doctor's discomfort in prescribing Klonopin to a woman in her third

4

trimester of pregnancy, Mother apparently said she would just go see her obstetrician or her own father (who was a psychiatrist) for a refill.

In February 2015, Z.C. was born via cesarean section, weighed only four pounds at full term, and was admitted to the neonatal intensive care unit due to low blood sugar (hypoglycemia). At the hospital, Mother appeared disheveled and dirty, and was concededly malnourished. She disclosed smoking cigarettes during her pregnancy, as well as taking Klonopin and Effexor for anxiety, but did not disclose her Vicodin use to attending medical personnel. Nurses were concerned that Mother did not want to see or feed the baby. Toxicology tests based on urine for Mother and Z.C. were negative.

However, a meconium toxicology screen for Z.C. reported positive for opiates. Z.C.'s doctor stated the test would only report positive (and at such a high level) if Mother had either taken "a high amount of Vicodin" or heroin during pregnancy. When questioned by the Agency's social worker, Mother answered, "Of course I'm addicted to my pain medication, I've been taking them for [eight] years." Mother said she was willing to go to a residential treatment program and agreed to see a substance abuse counselor. At the jurisdictional hearing, Mother clarified that she did not believe she was "addicted" to drugs, but merely had a "dependency" on pain pills, in the sense that she would experience physical withdrawal symptoms without them. She further explained that she had only agreed to attend a drug treatment program so that Z.C. could remain with her, and not because she thought treatment was necessary.

After receiving Z.C.'s meconium drug screen results, doctors began administering Methodone to treat the baby's withdrawal symptoms. The hospital attempted to take Z.C.

5

off treatment, then reinitiated it because "[Z.C.] was not doing well her first day off of Methadone." She was "not sleeping, crying, vomiting, had a low temperature[,] and her skin was [mottled] with blue and white spots." Z.C. would require Methadone treatment for weeks, well after hospital discharge. In addition, Z.C. had an "abnormal neuro[logical] exam," which her attending physicians reported was "likely related to [Mother's] intake of Klonopin and Effexor" during pregnancy.

Father was aware of Mother's cigarette smoking and prescription drug use throughout her pregnancy, including her use of leftover Vicodin. Father had assisted in administering Mother's prescription drugs, which he believed to be appropriate and condoned by doctors. When informed that a drug test had confirmed Mother's use of Xanax during her third trimester (against a doctor's instructions), Father stated, "the test can't be true." One of Mother's relatives reported that Mother had seemed more distant in the previous three or four years. Another of Mother's relatives believed that Mother may not have the capability to realize the extent of her own addiction, and Mother had rejected nonaddictive, alternative pain management methods in the past.

Throughout the Agency's involvement with Z.C., Father and Mother were cooperative. They both voluntarily submitted and tested negative to several drug tests requested by the Agency. After Z.C.'s discharge from the hospital, Mother was having positive visits with Z.C., and Father agreed on a safety plan with the Agency. Mother developed a list of ways to manage her chronic pain without the use of narcotic medications and completed several online courses on child care and substance abuse, but did not participate in a drug addiction treatment program.

6

The juvenile court made true findings on the petition's allegations by a preponderance of the evidence.  Z.C. was placed in the custody of her parents.  Mother and Father filed timely appeals, and challenge only the court's jurisdictional finding.

DISCUSSION

The substantial evidence test is the appropriate standard of review for the juvenile court's jurisdictional findings.  (*In re J.K.* (2009) 174 Cal.App.4th 1426, 1433.)  We uphold the juvenile court's findings if after reviewing the entire record and resolving all conflicts in favor of the respondent and drawing all reasonable inferences in support of the judgment, we determine there is substantial evidence to support the findings.  (*In re Monique T.* (1992) 2 Cal.App.4th 1372, 1378 (*Monique T.*).)  Substantial evidence is evidence that is reasonable, credible, and of solid value.  (*In re Savannah M.* (2005) 131 Cal.App.4th 1387, 1393.)

A juvenile court may determine a child is subject to the court's jurisdiction if it finds by a preponderance of the evidence that "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child, or the willful or negligent failure of the child's parent or guardian to adequately supervise or protect the child from the conduct of the custodian with whom the child has been left, . . . or by the inability of the parent or guardian to provide regular care for the child due to the parent's or guardian's mental illness, developmental disability, or substance abuse."  (§ 300, subd. (b)(1).)  A child shall continue to be a dependent child

7

pursuant to section 300, subdivision (b)(1), "only so long as is necessary to protect the child from risk of suffering serious physical harm or illness." (*Ibid.*)

Dependency jurisdiction must be based on conditions which exist at the time of the jurisdictional hearing. (*In re Rocco M.* (1991) 1 Cal.App.4th 814, 824.) Previous acts of neglect can be an indicator of future risk of harm. (*In re David M.* (2005) 134 Cal.App.4th 822, 830.) The "prenatal use of dangerous drugs by a mother is probative of future child neglect." (*In re Troy D.* (1989) 215 Cal.App.3d 889, 897, 899-900 [discussing how a mother's unreasonable acts of ingesting dangerous drugs while pregnant creates a legal presumption of jurisdiction over drug addicted newborn baby]; *Monique T.*, *supra*, 2 Cal.App.4th at p. 1379 [same].)

Substantial evidence supports the court's true finding of jurisdiction. Z.C. was born quite small, drug dependent, and required ongoing medical treatment for her withdrawal symptoms, which doctors attributed directly to Mother's prenatal drug use. Contrary to Mother's and Father's assertion, Dr. Crownover positively denied recommending Mother use Vicodin in lieu of Tramadol during her pregnancy, which is confirmed by the lack of any discussion regarding Vicodin in his patient notes. Mother testified she had a "physical dependency" on pain medication. At one point, she had admitted to being "addicted" to pain pills, having taken them for eight years preceding Z.C.'s birth. She had taken Xanax in her third trimester against her doctor's recommendations. Sufficient evidence supports that Mother was underestimating or minimizing her dependency on pain medication. Further, she failed to disclose her daily use of Vicodin to medical personnel at the time of Z.C.'s birth despite being a registered

8

nurse; instead, Mother waited for Z.C.'s condition to be discovered through a meconium toxicology screen. She was of advanced age and had not consistently sought prenatal care, which may have minimized or mitigated the harm to Z.C. Mother's actions caused substantial physical harm or illness to Z.C.

Substantial evidence also supports a continuing risk of harm to Z.C. at the time of the jurisdictional hearing. Mother and Father cite cases standing for the proposition that drug use alone, or an isolated instance of reckless drug use, does not establish a substantial ongoing risk of harm to a child. (E.g., *In re Destiny S.* (2012) 210 Cal.App.4th 999, 1003 [something " 'more' " than a parent's use of marijuana is required]; *In re J.N.* (2010) 181 Cal.App.4th 1010 [single episode of drunk driving].) The legal proposition is not controversial, but this case is distinguishable. The record supports, at minimum, that Mother had been physically dependent on pain pills for eight years, and she could not end the dependency/addiction during her pregnancy even knowing of significant risks to her unborn child's health. She then failed to disclose her dangerous drug use to the hospital, causing Z.C. unnecessary pain. Mother testified about her significant nerve and spinal conditions, her struggles to manage severe "chronic" pain for over a decade, becoming disabled, and being unable to work. Mother was also diagnosed bipolar; suffered from mood swings, anxiety, and depression; and Z.C. was a very young, vulnerable infant requiring round-the-clock care. Although Mother had begun addressing her protective issues, the court could reasonably conclude that a current and ongoing risk of harm to Z.C. existed at the time of the jurisdictional hearing.

9

Furthermore, the record supports that Father would not adequately protect Z.C. without the court's oversight; he was aware of Mother's drug dependency and enabled Mother's behavior without sufficient concern for the detrimental effects on his baby's health. Specifically, Father was aware that Mother used Vicodin on a daily basis during her third trimester of pregnancy, even though the medication had not been presently prescribed. He also knew she was not seeking consistent prenatal care despite her chronic pain management and mental health issues, and refused to believe she had used Xanax against a doctor's recommendation. Consequently, the evidence established Z.C. had suffered and was at substantial risk of suffering serious physical harm or illness due to a parent's inability to adequately supervise or protect her. (See § 300, subd. (b).)

## DISPOSITION

The judgment is affirmed.

HALLER, Acting P. J.

WE CONCUR:


McINTYRE, J.


IRION, J.