Filed 1/31/25  In re I.P. CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| In re I.P. et al., Persons Coming Under the Juvenile Court Law. | C100371 |
| SACRAMENTO COUNTY DEPARTMENT OF CHILD, ADULT AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>E.L.,<br><br>Defendant and Appellant. | (Super. Ct. Nos. JD240129, JD242557) |

Appellant E.L., mother of minors I.P. and W.P., appeals from the juvenile court's jurisdictional and dispositional orders finding that minors come within the provisions of Welfare and Institutions Code section 300, subdivision (b) and adjudging them

1

dependents of the court. (Welf. & Inst. Code, §§ 300, 361, 395.)[1] Mother contends that the evidence was insufficient to support jurisdiction, the application of the detrimental condition presumption in section 355.1 was improper, and the juvenile court applied an incorrect legal standard in considering expert opinion testimony. The Sacramento County Department of Child, Family and Adult Services (Department) concedes that there was insufficient evidence to support jurisdiction and does not oppose reversal. Given the record before us, we accept the Department's concession and reverse.

BACKGROUND

In September 2019, the Department filed a non-detaining section 300 petition on behalf of I.P. Both I.P. and mother tested positive for amphetamine and methamphetamine at the time of his birth. Mother denied any illicit drug use and suggested that the positive test results may have resulted from her prescription medications. Although this explanation was ruled out by lab results, mother continued to insist that her prescription medications caused the positive toxicology results. Mother had several subsequent positive tests in the month following I.P.'s birth (and was reportedly breastfeeding at the time), but later tests were negative for all substances and mother reported she was taking different medication. The Department determined that there were sufficient safeguards in place, including father's presence in the home and ample family support, and the juvenile court dismissed the section 300 petition at the November 2019 jurisdiction hearing.

On March 16, 2023, the Department received a referral reporting that mother tested positive for amphetamine and methamphetamine at the delivery of newborn W.P. Mother denied using any illicit drugs and asserted that she tested positive due to her prescription medications. Mother was reportedly taking between seven and 13 different

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

medications or supplements, including oxycodone, labetalol, and nifedipine. W.P. had no withdrawal symptoms, but his meconium was sent for testing. Mother said that she was not going to breastfeed W.P. due to the allegations and that she would feed him formula.

Father reported no concerns about mother testing positive for methamphetamine and denied having any knowledge of mother using illicit drugs. Mother's physician, who prescribed her medications, did not believe mother was using methamphetamine; the physician had no concerns about mother as a parent and believed she was a "great mom." Minors' maternal grandmother, whom mother listed as her support person, agreed to stay at the home and not allow W.P. to be left with mother without supervision. I.P. told the social worker that his parents took good care of him; he did not know what drugs or alcohol were. He said he was happy living with his parents, although father would eat all the food. Father was sometimes mean to mother, but I.P. had never seen them fight with their hands.

On March 21, 2023, W.P.'s meconium lab results came back positive for methamphetamine and amphetamine. Mother tested positive for amphetamine, methamphetamine, and oxycodone on March 21 and 23, 2023.

Minors' maternal grandmother did not observe mother using any drugs during the time she (maternal grandmother) stayed with the family. She reported that mother was just fine with minors and said she did not understand why mother " 'needs a babysitter.' " Minors' maternal great-uncle and maternal great-aunt likewise reported no suspicions of drug use by mother, and they expressed no concerns for the children. Another great-uncle and great-aunt, as well as minors' paternal grandmother, were also unaware of any drug use by mother. A family friend, B.L., who had known parents for eight years and also provided support to mother, said mother was an "amazing mother" and she (B.L.) had no suspicions of any drug use by either parent.

On April 3, 2023, the social worker met with mother and father to explain the March lab results. Father was holding and feeding W.P. Mother appeared attentive and

3

responded to W.P.'s cues.  She denied using any illicit drugs, claiming her prescription medication caused false positive tests.

That same day, mother tested positive for oxycodone and alcohol.  She tested positive for amphetamines and alcohol on April 5, 2023, positive for alcohol on April 13, 2023, and positive for methamphetamine on April 17, 2023.

On May 18, 2023, parents agreed that father would be the primary caregiver for minors and that mother would be supervised when she was with them.  Parents agreed to informal supervision services.  Mother's support person, B.B., also agreed to not allow mother to be unsupervised with minors.

Parents did not drug test for two weeks in June 2023.  The Department was concerned that minors were at risk as a result of parents' failure to comply with consistent drug testing and assessments, mother's continued denial of substance abuse despite positive tests for amphetamines and methamphetamines, parents' failure to acknowledge mother's substance abuse, and parents' failure to engage in services.

On June 26, 2023, the Department filed petitions on behalf of I.P. (then three years old) and W.P. (then three months old), alleging that minors came within the provisions of section 300, subdivision (b)(1).  The petitions alleged that mother had a substance abuse problem from which she failed and/or refused to rehabilitate and that her substance abuse issues impaired her judgment and ability to adequately care for and supervise minors.  The petitions asserted that mother tested positive for amphetamine and methamphetamine at the time of W.P.'s delivery and that W.P.'s meconium tested positive for amphetamine and methamphetamine.  Mother also had a positive prenatal exposure test for amphetamine and methamphetamine on October 6, 2022, and her post-delivery urinalysis toxicology screenings on March 21, March 23, and April 17, 2023 were positive for amphetamine and methamphetamine.  The petitions alleged that mother's ongoing substance abuse problem placed minors at substantial risk of physical harm, abuse, and/or

4

neglect.[2] Mother insisted that she had never used amphetamine or methamphetamine and that the positive test results were due to prescribed medications she was taking. At the July 2023 initial hearing, the juvenile court ordered minors to remain in parents' custody under the Department's supervision.

Minors' maternal grandmother reported that mother had never had a drug problem and that mother was very attentive to her children. Maternal grandmother said that father "is always there and provides both children with what they need." She was aware that mother had a previous, similar case and stated that mother "went through a lot of trouble to prove that it was her prescribed medications not illicit substances." Maternal grandmother cleaned the entire home while parents were in the hospital with W.P., and she never saw anything suggestive of illicit substance abuse. She said the children were doing well and W.P. was thriving. She had never seen mother appear under the influence of any illicit drugs.

On August 2, 2023, the social worker met with the family in their home. Minors showed no signs of abuse or neglect. Father was minors' primary caregiver and was always home with them. Mother worked from 8 a.m. to 5 p.m., Monday through Friday. Parents confirmed that W.P. was born premature, but he was not in the NICU and did not have any withdrawals. Mother reported that W.P. was sleeping well and was drinking six ounces of baby formula every three to four hours. I.P. was doing well with no behavioral issues, although he needed constant supervision to prevent him from trying to scratch his eczema.

Parents shared pick-up and drop-off duties for I.P.'s daycare. On August 17, 2023, the social worker met with daycare staff, who reported that I.P. had been attending their

---

[2] The petitions also initially alleged that father failed to provide adequate care and supervision because he knew or should have known of mother's substance abuse problem, but that allegation was later dismissed by the juvenile court.

daycare since he was two years old and that they never had concerns about parents' care for I.P. or witnessed parents under the influence.

The social worker went to the family home on several more occasions, including an unannounced visit in November 2023. The home was clean, safe, and appropriate. The social worker did not have any safety concerns about the home or the adequacy of food and supplies. Minors were dressed appropriately, appeared happy and healthy, and showed no signs of abuse or neglect. Both minors appeared developmentally on track. The social worker observed parents to be attentive to their needs, and minors appeared comfortable going to parents to have their needs met. There had been no reports of concerns about the adequacy of parents' care or of any abuse or neglect.

W.P.'s medical records reflected that W.P. spent three days in the hospital after his birth. His delivery had been complicated by a "3 tight nuchal cord." Mother's medical history included chronic hypertension and attention deficit hyperactivity disorder, and she was noted to have taken "PNV," labetalol, nifedipine, and aspirin during pregnancy. The notes also indicated that labetalol can have a false positive for methamphetamine on a urine toxicology screen but stated that it was highly unlikely to cause a false positive with confirmatory positive results.

When parents brought W.P. to his one-week newborn exam, he weighed four pounds, 14.3 ounces. The questionnaire for the visit indicated that W.P. ate some breast milk and some formula. The comments from the exam noted that W.P. was not in acute distress and was "well-developed and well-nourished." His pupil, cardiovascular, and pulmonary assessments were normal. It was recommended that his diet be supplemented with pumped breast milk.

Eleven days later, W.P. was seen for breastfeeding difficulty. He weighed five pounds, 13.6 ounces and was noted to be breastfeeding at most feedings and bottle feeding four to five times a day. The following day, W.P. weighed six pounds, 3.2 ounces and was eating both breast milk and formula. His respiratory exam did not raise any

concerns. Mother's history of positive methamphetamine and amphetamine tests was noted, along with her claim of false positives due to her medication. At his one-month visit, W.P.'s doctor noted that his weight "look[ed] good" at seven pounds, three ounces. He was still eating both breast milk and formula.

At his two-month exam, W.P. was reported to be eating only formula. The notes indicated that W.P. would be starting daycare in one to two months "as mom goes back to work." W.P. was not in acute distress and was well-developed and well-nourished. His pupil, cardiovascular, and pulmonary assessments were normal. He weighed 10 pounds, five ounces. W.P. had similar medical summaries after his four-month and six-month exams. He continued to gain weight, was reportedly eating only formula, and had no pupil, cardiovascular, or pulmonary issues.

Mother tested positive for alcohol use on six occasions, tested negative for substances on seven occasions, and failed to test on 10 occasions. After she was discharged from the testing program in August 2023 for failing to test, she began testing with the Just Say No program. Those tests were not random and were not sent to a laboratory for confirmation. Mother tested three times (twice in August 2023 and once in September 2023) with Just Say No, and those test results were negative. Mother was unresponsive to efforts at mobile testing thereafter.

The Department gathered information regarding the accuracy of mother's test results and whether the positive results could be due to her prescribed medications. Among other information gathered, a forensic toxicologist explained that mother's March 21, 2023 urine specimen had been analyzed using scientifically accepted methods "such as liquid chromatography tandem mass spectrometry." The toxicologist opined that "the results are consistent with exposure to methamphetamine." She also reported that mother's medication was not known to contain or metabolize to amphetamine or methamphetamine. Although "[t]he literature does report false positive *screen* results

7

following the ingestion of labetalol," confirmatory testing "rules out false positives through specific identification of a particular drug or drug metabolite." (Italics added.)

At a January 2024 combined jurisdiction and disposition hearing, the juvenile court noted that this was the second time a section 300 petition had been filed as a result of mother and her newborn testing positive for methamphetamine at the time of delivery, and, on both occasions, mother denied using methamphetamine. The court considered the test results and the toxicologist's opinion regarding the possibility that the results were false positives. The court stated: "[A]s I believe the evidence requires me to find, that on those occasions, Mom has tested positive for methamphetamine and those results are not the result of a prescribed medication."

The juvenile court further found that the presumption of a detrimental condition set forth in section 355.1 applied and that mother had failed to rebut the presumption. The court reasoned: "Given that Mom does not admit methamphetamine use, that she has tested positive on multiple occasions, that she used while pregnant with her sons, and that her use while pregnant with [W.P.] came on the heels of a prior dependency case, and that she has not submitted to laboratory confirmed tests at least for a number of months following that April 17th test, I don't see how I can find that that presumption has been rebutted." The court therefore found that W.P. "has suffered serious physical harm both as a result of mom's failure or inability to adequately protect and by her inability to provide regular care due to her substance abuse, and on that basis [W.P.'s] 300(b)-1 allegation is sustained."

The juvenile court additionally concluded that the allegations of the petition could be sustained on the ground minors faced a substantial risk of physical harm as a result of mother's substance abuse. The court noted that mother was high-functioning and that parents "are able to provide for their children, both of whom, by all accounts, appear to be thriving." There was no evidence "from any witness that has known and interacted with Mom outside the context of this case that they believe that she uses

8

methamphetamine." But the court concluded that "in at least one important regard, it appears that she's not able to manage her use, and that's an inability to control when she uses. She continued to use after [W.P.'s] birth when she knew she would be tested. She was unable, more importantly it appears, to stop using while pregnant."

The juvenile court acknowledged that, under California law, "substance abuse without more is not a sufficient ground to assert jurisdiction." But "this does not . . . appear to be a case where a parent or guardian takes specific steps to control the use of a dangerous substance and ensure that it doesn't affect the children. Instead, in this case, we don't have admission to use and we don't have an apparent ability to control when use occurs." The court additionally observed that mother "managed to go a number of months without submitting to laboratory-confirmed testing," and her explanation for the positive tests "has been pretty thoroughly refuted by the evidence in this case and similar evidence in [I.P.'s] case." In light of this evidence, the court assumed "that there's a possibility that Mom may still be using and that she does not have the ability to control when she uses, and I find that evidence is sufficient to sustain the [300](b)-1 allegations in both [minors'] petitions and that they are at substantial risk."

The juvenile court adjudicated minors dependent children of the court and placed them in parents' care under the Department's supervision. Parents were provided family maintenance services, and a review hearing was set.

Mother timely appealed. The matter was fully briefed in this court on October 11, 2024.

DISCUSSION

Mother challenges the juvenile court's jurisdictional ruling, arguing that there was insufficient evidence that minors were at substantial risk of harm as a result of her substance abuse and that the juvenile court erred in applying the presumption of a detrimental condition under section 355.1. Mother also contends that the juvenile court applied the wrong legal standard in accepting expert testimony that the positive drug tests

9

were the result of mother's use of methamphetamine, rather than her prescribed medication as she claimed. We need not address mother's argument regarding the juvenile court's consideration of the expert testimony because, as the Department concedes, even assuming that mother used methamphetamine, the evidence was insufficient to support jurisdiction on the record in this case.

A juvenile court has jurisdiction to declare a child a dependent of the court under subdivision (b)(1) of section 300 when the child "has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of any of the following: [¶] (A) The failure or inability of the child's parent or guardian to adequately supervise or protect the child. [¶] . . . [¶] (D) The inability of the parent or guardian to provide regular care for the child due to the parent's or guardian's mental illness, developmental disability, or substance abuse." A child welfare agency bears the burden to prove jurisdiction by a preponderance of the evidence. (§ 355, subd. (a); *In re I.J.* (2013) 56 Cal.4th 766, 773.) We review jurisdictional findings for substantial evidence, reviewing the record in the light most favorable to the juvenile court's determination and drawing all reasonable inferences from the evidence to support the court's findings and orders. (*In re I.J.*, *supra*, at p. 773.)

Our state Supreme Court has made clear that substance abuse by a parent, standing alone, is not sufficient to establish dependency jurisdiction under section 300, subdivision (b)(1)(D). (*In re N.R.* (2023) 15 Cal.5th 520, 550, 555-556.) "[D]ependency jurisdiction under section 300[, subdivision ](b)(1)(D) requires more than just the identification of substance abuse by a parent or guardian. A court must also find that the parent or guardian is unable to provide regular care for a child and that as a result, the child has suffered serious physical harm or illness or is at significant risk of suffering serious physical harm or illness." (*Id.* at p. 556.) The term " 'substance abuse' [bears] its ordinary meaning—essentially, the excessive use of drugs or alcohol." (*Id.* at p. 531.)

10

As the Department concedes, even assuming mother used drugs during and after her pregnancy with W.P., there was a lack of substantial evidence showing a nexus between her substance abuse and substantial harm or risk of harm to minors. The Department did not present evidence that W.P. suffered physical harm or illness as a result of exposure to drugs. It was not shown that prenatal drug exposure was the reason he was born premature or that he suffered any withdrawal or other symptoms as a result of his exposure. Although mother initially breastfed W.P., he was 10 months old by the time of the January 2024 hearing and had reportedly been consuming only formula (no breast milk) since his two-month doctor's visit. There was no evidence that anyone had observed mother acting as if she were under the influence, that minors were not being properly cared for, or that they were exposed to unsafe conditions. The social worker reported that the family home was clean, safe, and appropriate; that minors appeared happy, healthy, and developmentally on track; and that parents were attentive to minors' needs. On this record, there is a lack of substantial evidence that mother was unable to provide regular care for minors or that they were subject to a substantial risk of serious physical harm. (*In re N.R.*, *supra*, 15 Cal.5th at p. 558.)

We also conclude that substantial evidence fails to support the application of the detrimental condition presumption in section 355.1 in this case. That section provides in relevant part: "Where the court finds, based upon competent professional evidence, that an injury, injuries, or detrimental condition sustained by a minor is of a nature as would ordinarily not be sustained except as the result of the unreasonable or neglectful acts or omissions of either parent, . . . that finding shall be prima facie evidence that the minor is a person described by subdivision (a), (b), or (d) of Section 300." (§ 355.1, subd. (a).) This statutory presumption applies when a child is " 'diagnosed as being born under the influence of a dangerous drug' " or when a child tests positive at birth and also suffers severe medical problems as a result of the drug. (*In re J.A.* (2020) 47 Cal.App.5th 1036,

11

1049; *In re Troy D.* (1989) 215 Cal.App.3d 889, 897; *In re Monique T.* (1992) 2 Cal.App.4th 1372, 1378-1379.)

In this case, the Department presented no competent professional evidence that W.P. was born addicted to amphetamine or methamphetamine, that he was under the influence of either drug, or that he suffered from withdrawals or other adverse effects. While his meconium tested positive for methamphetamine and amphetamine at birth, the Department did not introduce evidence identifying the level of those substances in W.P.'s meconium or whether or how their presence gave rise to a serious injury or detrimental condition. While we have no difficulty imagining that the use of methamphetamine during pregnancy could result in a detrimental condition within the meaning of the statute, the Department did not present such evidence in this case. Accordingly, the juvenile court should not have applied the detrimental condition presumption in section 355.1. (*In re B.D.* (2024) 103 Cal.App.5th 315, 329; *In re J.A.*, *supra*, 47 Cal.App.5th at p. 1049.)

We appreciate the juvenile court's concern about mother's positive tests, the lack of evidentiary support for her explanations, and her failure to regularly test. If new facts or evidence concerning mother's ability to care for minors emerge, the Department may file a new section 300 petition. (*In re Janet T.* (2001) 93 Cal.App.4th 377, 392.) On the record before us, however, the jurisdictional findings under section 300, subdivision (b) must be reversed. (*In re N.R.*, *supra*, 15 Cal.5th at p. 558.)

DISPOSITION

The jurisdictional findings and orders of the juvenile court are reversed.  The disposition and all subsequent orders are vacated.


/s/
FEINBERG, J.



We concur:



/s/
DUARTE, Acting P. J.



/s/
BOULWARE EURIE, J.

13