Filed 4/20/20 (unmodified and unpublished opinion attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re J.A. et al., Persons Coming Under the Juvenile Court Law. | B297416 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. 19CCJP00773) |
| Plaintiff and Respondent, | **ORDER MODIFYING OPINION AND CERTIFYING OPINION FOR PUBLICATION** |
| v. | |
| D.D., | **[No Change in Judgment]** |
| Defendant and Appellant. | |

THE COURT:

GOOD CAUSE APPEARING, the opinion in the above-entitled matter filed on April 1, 2020, was not certified for publication in the Official Reports. For good cause, it now appears that the opinion should be published in the Official Reports and be modified as follows:

On page 17, full first paragraph beginning with "Department's only other evidence . . ." change the word "suggestions" to "suggestion" in the last sentence.

There is no change in judgment.

It is so ordered.

_____

RUBIN, P. J.                    MOOR, J.

Filed 4/1/20 In re J.A. CA2/5 (unmodified and unpublished opinion)

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re J.A. et al., Persons Coming Under the Juvenile Court Law. | B297416 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>D.D.,<br><br>        Defendant and Appellant. | (Los Angeles County Super. Ct. No. 19CCJP00773) |

APPEAL from orders of the Superior Court of Los Angeles County. Philip L. Soto, Judge. Reversed.

Paul A. Swiller, under appointment by the Court of Appeal, for Defendant and Appellant.

Mary C. Wickham, County Counsel, Kristine P. Miles, Assistant County Counsel and Sally Son, Deputy County Counsel, for Defendant and Respondent.

_____

Mother D.D. appeals from the order adjudicating her two children, J.A. (Toddler) and D.Y. (Baby) dependent, and the dispositional order

placing the children in her home, but requiring her participation in certain programs and services.  The sole basis of dependency was mother's use of medical marijuana while pregnant with Baby.  We conclude the evidence is insufficient to establish mother abused marijuana or that any such substance abuse placed the children at risk of serious harm.  We therefore reverse.

## FACTUAL AND PROCEDURAL BACKGROUND

The family came to the attention of the Los Angeles County Department of Children and Family Services (DCFS or Department) at Baby's birth, when he and mother tested positive for marijuana.  Toddler had just turned four years old.  The boys' fathers are unknown and were not parties to this proceeding.

### 1.     *Baby's Birth and Mother's Marijuana Use*

Baby was born in December 2018.  When mother and Baby tested positive for marijuana, mother admitted consuming edible marijuana.  She denied smoking marijuana.[1]  Mother explained that she had researched her pregnancy symptoms and read articles online which indicated that marijuana would be the safest alternative to pills to treat her symptoms.  Mother has a medical marijuana card, and used the marijuana to help with pain and swelling.  However, she conceded that, although she had obtained prenatal care, she did not inform her doctor about her marijuana usage, believing that the doctor would have judged her.

---

[1]     The record indicates that mother admitted smoking five to six cigarettes per day.  Given mother's repeated denial of smoking marijuana, this admission appears to relate to tobacco cigarettes.

There is some dispute in the record as to whether mother admitted using medical marijuana "throughout" her pregnancy or only for the last few months. Similarly, there is some dispute as to whether she admitted taking it every day or only as needed.

After Baby's birth and positive test, the doctor told mother that she could not breastfeed until she tested clean, so mother stopped taking marijuana. Mother's drug test on December 13, 2018, a few days after Baby's birth, was still positive for cannabinoids. Thereafter, on December 28, 2019, mother tested negative. Mother appeared for several more drug tests during the course of the proceedings. The only results which are in the record are negative, and DCFS makes no assertion that mother tested positive after December 13, the day that Baby was three days old.

Mother has no criminal history. Mother lived with maternal grandmother; maternal great-grandmother lived nearby and both women helped with child care. (As there are no paternal relatives in this case, we simply refer to "grandmother" and "great-grandmother.") Mother stated that she safely stored her medical marijuana edibles on a top shelf away from Toddler. There was no evidence to the contrary. Mother explained that, although she took medical cannabis, she was never under the influence when she was caring for Toddler, and was never "high." Great-grandmother concurred that mother was never high. There is some objective evidence to support mother's assertion that her cannabis use did not render her unable to care for the children. On December 12 – one day before mother's drug test showed that she was still positive for cannabinoids – the social worker met with mother, and described her as "cooperative, easy to engage and presented with an appropriate affect.

3

Mother displayed no visible indication of cognitive impairment or substance use." She observed mother interacting with Baby "in an appropriate and nurturing manner."

## 2. *The Department's Informal Intervention*

The initial referral from the hospital came to DCFS's attention on December 11, 2018.[2] The Department did not immediately file a petition but instead attempted to resolve any problems with mother's voluntary participation.

After mother's release from the hospital, a social worker did a home visit of grandmother's house, where mother and the children lived. There were a lot of pets there; the house smelled like animals and the social worker saw several cats and heard dogs barking behind a closed bedroom door. The home "had a foul odor mixed with cleaning products." She noted the refrigerator and freezer were "dirty," and that there was "minimal food" in the refrigerator – only milk, eggs, and a few other items. Mother explained that she had just received her financial assistance and would be grocery shopping soon. The record also indicates that mother herself had been a dependent child, based on, among other things, grandmother's drug use. However, in 2008, after mother had been removed from grandmother's home and reunification services had been terminated,

---

[2]    In addition to reporting mother's admission of prenatal marijuana usage, the referral stated that the attending nurse had observed mother to be very rude and cursing at grandmother and Toddler. This is the only indication in the record that mother was anything other than even-tempered with her family.

4

grandmother successfully filed a petition under Welfare & Institutions Code section 388, and mother was returned to grandmother's home.[3] Although grandmother had obtained sobriety in 2008 – sufficient for mother to be returned to her custody – the Department would later use grandmother's drug history to question mother's housing choices in this case.

A week after mother's release from the hospital, mother moved to great-grandmother's home, saying there were too many pets at grandmother's home and she did not want Baby to feel uncomfortable. The social worker did a home visit at great-grandmother's home, and found the home to be "clean, adequately furnished and stocked with sufficient food supply, age appropriate toys and clean clothing and linens." There were no visible safety hazards and no signs of drug abuse. Great-grandmother would allow the family to stay as long as necessary; however, she was having heart surgery in a few days.

At a home visit with a nurse, Baby was observed to have no developmental concerns. The nurse explained, however, that because of his prenatal exposure to marijuana, he might possibly show delays when he is older. Interviews with Toddler never raised any cause for concern. Mother took both children to the doctor as necessary.

On January 8, 2019, mother explained that housing was still a concern. Great-grandmother was in the hospital, awaiting triple bypass surgery. Once she returned home, she would need time to recover without

---

[3]     All undesignated statutory references are to the Welfare and Institutions Code.

5

the children present. Mother told the Department that she was "hesitant" to go to a homeless shelter.

Mother's housing situation became more dire by mid-January, when both grandmother and great-grandmother received eviction notices and were told be out of their respective homes by February 1. The Department gave mother information about a shelter, and mother promised to follow up. Mother also agreed to participate in Voluntary Family Maintenance.

On January 22, mother reported that she was not willing to move to the temporary shelter because of her young children. She planned to return to grandmother's home until grandmother's eviction hearing. She explained that the Los Angeles County Department of Public Social Services had offered her hotel vouchers which she would use if grandmother were evicted. The social worker explained that the Department had concerns about mother returning to grandmother's home because, at the home visit, "the home appeared unkept, there was no food in the home and [grandmother] has an extensive substance abuse history." Mother responded that she plans to buy food for the home. At this point, the Department considered mother to have declined Voluntary Maintenance Services, and considered filing a petition.

Before we discuss the proceedings, there are two other factual issues which need to be explained: Toddler's possible need for speech therapy and an inconclusive prior referral.

### 3.    *Toddler's Need for Speech Therapy Evaluation*

Mother took Toddler to the pediatrician regularly. As early as January 2018, his pediatrician noted a speech delay and referred him for speech therapy. Mother was told to contact the school district to obtain

6

speech therapy; she did not do so. In November 2018, Toddler was again seen in the clinic (for a flu vaccine). A speech delay was again noted, and mother was directed to bring him back in three weeks for further evaluation. She did not do so. The child was next seen on December 21, 2018, for an infection. Mother was again advised that he needed speech therapy. She was also told he needed medication for hyperactivity and oppositional disorder. On January 4, 2019, his doctor prescribed medication for the hyperactivity, and once again pointed out that his speech was poor.

When a Department social worker had interviewed Toddler on December 28, she thought he might have a speech impediment or delay. Mother agreed that the pediatrician had recommended Toddler obtain speech therapy at the school where he attended pre-K classes. The social worker recommended that mother ask for an IEP (Individualized Education Program); mother said she would look into it. On January 8, 2019, mother reported that the school said it did not perform assessments and referred her someplace else, which she had not yet had a chance to call. Mother also explained that she had initially been hesitant to medicate Toddler for his behavior, but had begun doing so and she had seen an improvement in Toddler's behavior. Mother agreed to call Los Angeles Unified School District (LAUSD) as soon as possible to get Toddler assessed for speech delay.

On January 17, mother reported that she called LAUSD for the speech assessment, but was told to call back later because they were on strike.

On February 1, 2019, the social worker called mother and asked if she had followed up on the speech evaluation for Toddler. Mother stated that she spoke with a psychologist, who felt that Toddler's speech was on target and he did not need any speech therapy or intervention. The psychologist also advised her to stop his hyperactivity medication, as the psychologist felt he was too young to receive medication. The social worker asked for the contact information of the psychologist; mother said she would text it later.

The petition was filed on February 5, 2019, and supported by a non-detention report. A hearing was held on February 6, 2019. At the hearing, mother's counsel explained that mother had Toddler assessed for an IEP, and brought a copy of the assessment to court. Mother was to provide a copy to the Department. The report is dated January 31, 2019. It indicates that the evaluation was conducted by a Special Education Teacher, a School Psychologist, and a Language and Speech Specialist, all of whom were identified by name. It reports that mother's concern was "Articulation." The "Speech and Language" section of the evaluation states that Toddler has "[a]ge appropriate articulation." The "Health" section reads that he has been on medication "to calm him down" since December, and states, "it is not effective." Toddler was assessed as "age appropriate" in all categories, with no referral to Regional Center or for rescreening.

Given that this evaluation was conducted by a psychologist on January 31, and concluded Toddler needed no speech therapy, it is apparent that this was what mother was referring to when, on February 1, she told DCFS that a psychologist had told her Toddler did not require speech therapy.

8

**4.** *The Inconclusive Prior Referral*

In December 2015, when Toddler was one year old, there was a referral of general neglect and physical abuse against mother, which was resolved as inconclusive as to neglect and unfounded as to abuse.

An anonymous reporter claimed that mother used cocaine, methamphetamine and medical marijuana, and was constantly high in front of Toddler. The reporter alleged that she left the drugs within Toddler's reach, and that she often left him alone in the house for several hours when she went out to purchase marijuana. The reporter alleged that when mother was home, she ignored Toddler, and he once fell in the pool because she was not watching him. The reporter said mother often left cleaning chemicals within the child's reach, and that she was observed physically striking the child on his face, mouth and hands.

Mother had, at this point, checked herself into the hospital because she had an anxiety attack and wanted to self-harm via cutting. She was released in a few hours and recommended to mental health services. Thereafter, at a meeting at the DCFS office, mother indicated she was pursuing mental health services to deal with her anxiety and post-partum depression, and also attended an addiction program – the same program which had previously helped grandmother recover. After the Department confirmed mother had enrolled in the mental health and addiction programs, and the family declined further services, the Department concluded the physical abuse referral was unfounded and the general neglect inconclusive, and closed the referral.

When asked in the current proceedings about the prior referral, mother stated that the referral was made vindictively by an ex-boyfriend,

who falsely alleged mother was using drugs; she said that she only used marijuana. Mother denied being enrolled in a drug addiction program and denied prior mental health services, post-partum depression, or suicidal ideation.

**5.** *The 300 Petition*

The petition to declare the children dependent was filed on February 5, 2019. It alleged the children were described by section 300, subdivision (b) in two counts. The first alleged that Baby was born with a positive toxicology screen for marijuana, which condition would not have occurred without unreasonable acts of mother, which place him at the risk of serious physical harm and emotional damage. The second alleged that mother has a history of substance abuse and is a current abuser of marijuana, which renders her incapable of providing regular care to the children. It further alleged that mother abused marijuana during her pregnancy with Baby, and on numerous prior occasions was under the influence of marijuana while providing care and supervision to the children. As the children are of such young ages as to require constant care and supervision, mother's substance abuse interferes with her ability to provide that care and endangers the children's health and safety.

There was no allegation of neglect based on any purported untreated mental health issues of mother, or general neglect leading to the failure to obtain necessary medical care. Both counts were based only on mother's alleged substance abuse.

The children were not detained, but remained placed in mother's home.

10

**6.**     *Non-Detention Hearing*

A non-detention hearing was held.  The Department's report for the hearing explained that the Department believed there was substantial danger to the children because the Department was "concerned about [m]other's lack of follow through with [the Toddler's] speech services." The Department was also "concerned about [m]other's mental health as [m]other was previously hospitalized on a 72-hour psychiatric hold for cutting herself shortly after [Toddler's] birth.  Mother has not followed up with her mental health services since her initial[] hospitalization."[4]  The Department did not suggest mother's alleged failures in this regard were in any way related to the alleged substance abuse.

DCFS's report further indicated that mother admitted using marijuana through her pregnancy with Baby and that a social worker's "safety assessment" indicated a "high risk for future abuse."  There was no further explanation of the reason for this assessment.

At the hearing, the court found a prima facie case and released the children to mother.  The court told mother to not use edibles or drugs of any kind; she said, "No problem."  The Department was to provide services to assist mother; mother was to drug test.

---

[4]     While mother completely denies any hospitalization or suicidal ideation, DCFS's characterization of this event overstates its own evidence. The social worker's description of the events related to the prior referral states, "Mother admitted that she was in the hospital because she had [an] anxiety attack and wanted to kill herself by cutting.  Mother stated that she was released in [a] few hours . . . ."  There is no evidence of a 72-hour hold or that she had actually cut herself.

## 7.  *Jurisdiction Hearing*

The jurisdiction hearing was held on March 18, 2019, approximately six weeks after the non-detention hearing.  In the intervening time, there were no problems identified in mother's care of the children.  The Department acknowledged the LAUSD assessment which mother had obtained on January 31, which indicated Toddler was age appropriate in speech.  However, the Department still took the position that mother continued to fail to identify the psychologist who told her, before February 1, 2019, that she should stop Toddler's hyperactivity medication.

The summary of the Department's findings, in its entirety, reads as follows:  "It is this DI's assessment that the mother still does not understand the risk she caused to the [Baby] by repeatedly consuming marijuana while pregnant.  Furthermore, she does not believe that being under the influence of cannabis inhibits her ability to parent or supervise her four-year-old son, [Toddler].  Additionally, the children's pediatrician reported that she instructed the mother to follow up with Regional Center and LAUSD for speech services.  On 1/4/19, [Toddler] was placed on Tenez for hyperactivity and was informed that [Toddler] had poor speech.  **On 2/1/19, [m]other informed CSW that [Toddler] was assessed by a psychologist and it was recommended that [m]other stop [Toddler's] psychotropic medication without medical consultation.**  However, [m]other was unable to provide any documents to support this recommendation by the psychologist or the name of the psychologist.  [¶] The mother does not believe she is at fault or did anything to warrant the Department and Dependency Court's involvement in her family's life.  She has reported feeling that cannabis was a safer alternative for pain

12

management than narcotics or any pain medication she could have been prescribed by a doctor. However, she also indicated that she failed to notify her treating obstetrician due to fear of judgment. The mother submitted to random toxicology screenings on 02/12/2019 and 02/20/2019, her results were negative at both [] occurrences. The family has a strong support system from extended maternal relatives, however they too believe the mother acted appropriately by using cannabis as an alternative to narcotics in effect to manage her pain during her pregnancy. Neither the mother nor maternal relatives appear to understand the seriousness of the mother's substance abuse during her pregnancy, or the fact that being under the influence of cannabis inhibits the mother's ability to parent[] and supervise a newborn as well as a hyperactive toddler. The maternal relatives appear to support the mother's decision to self-medicate. [¶] The Department is also concerned about [m]other's mental health, as [m]other was previously hospitalized on a 72-hour psychiatric hold for cutting herself shortly after [Toddler's] birth. Mother has not followed up with her mental health services since her initial hospitalization. Furthermore, the mother participated in an Up Front Assessment and the recommendation was for mother to receive[] mental health services. At this time, the mother feels she is not in need of any mental health services and reported that 'talking to someone doesn't work' for her. [¶] Without the Department and Dependency Court's supervision, it is highly likely that the mother will not follow through with services for [Toddler]. Such as speech services and mental health to address his hyperactivity and assist in behavior modification. Additionally, it is equally likely that the mother will not follow through with parenting, mental health services for herself nor will

13

she maintain a stable and sober lifestyle.  [¶]  Given mother's history with the Department, unstable housing and reported lack of follow through, it is the Department's recommendation that the family receive Family Maintenance Services, participate in Family Preservation Services and that the mother participate in random drug testing, individual counseling to address case issues, parenting program and follow up with academic support services, medical appointments and Regional Center services for the children.  Additionally, it is recommended that [Toddler] receive age appropriate services to address his hyperactivity and lack of focus."

At the hearing, mother argued that the only evidence supporting the petition is that she used marijuana edibles, but there was no evidence that either child was harmed by this.  Mother also argued she is no longer using and has tested clean.  Counsel for the children argued that the petition should be sustained simply because mother used marijuana while pregnant; she did not seek her doctor's approval before doing so; and the children were of tender years.

The court sustained the petition, but released the children to mother as there was no evidence that release would be detrimental to them.  The court stated that mother "is cooperative and will be able to take care of the children in her home if she continues to cooperate with the Department."  Drug testing and family preservation services were ordered.

Mother filed a timely notice of appeal.

### DISCUSSION

1.    *Standard of Review*

" 'We review the juvenile court's jurisdictional findings for sufficiency of the evidence.  [Citations.]  We review the record to

14

determine whether there is any substantial evidence to support the juvenile court's conclusions, and we resolve all conflicts and make all reasonable inferences from the evidence to uphold the court's orders, if possible. [Citation.] "However, substantial evidence is not synonymous with any evidence. [Citations.] A decision supported by a mere scintilla of evidence need not be affirmed on appeal. [Citation.] Furthermore, '[w]hile substantial evidence may consist of inferences, such inferences must be "a product of logic and reason" and "must rest on the evidence" [citation]; *inferences that are the result of mere speculation or conjecture cannot support a finding* [citations].' [Citation.] 'The ultimate test is whether it is reasonable for a trier of fact to make the ruling in question in light of the whole record.' [Citation.]" [Citation.]' " (*In re Drake M.* (2012) 211 Cal.App.4th 754, 763.)

## 2. *Elements Under Section 300, Subdivision (b)*

The children were declared dependent under section 300, subdivision (b)(1). That subdivision provides, in pertinent part, that a child may be declared dependent if "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of . . . the inability of the parent or guardian to provide regular care for the child due to the parent's or guardian's . . . substance abuse." The finding of dependency cannot be based on substance abuse alone; jurisdiction requires a substantial risk of harm to the child arising from the substance abuse. (*In re Alexis E.* (2009) 171 Cal.App.4th 438, 453.)

Mother argues there is insufficient evidence of both elements – that is, insufficient evidence of substance abuse and insufficient evidence of substantial risk of harm to the children arising from substance abuse.

15

DCFS does not separate its response with respect to the two elements, preferring instead a holistic approach that mother's prenatal use of marijuana supported the finding of dependency.

### 3.      *Insufficient Evidence of Substance Abuse*

The law is clear that jurisdiction must be based on substance *abuse*; mere substance *use* is not sufficient for jurisdiction. (*In re Drake M., supra*, 211 Cal.App.4th at p. 764.) However, the law is not in agreement on when substance use reaches the point of substance abuse. Division Three of the Second Appellate District concluded that a finding of substance abuse must be based on evidence sufficient to show that: (1) the parent had been diagnosed as a having a current substance abuse problem by a medical professional; or (2) the parent has a current substance abuse problem as defined by the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (4th rev. ed. 2000) (DSM-IV). (*Id*. at p. 766.) Division Seven of the Second Appellate District disagreed with the requirement of a diagnosis or evidence establishing the requirements of DSM-IV. (*In re Christopher R.* (2014) 225 Cal.App.4th 1210, 1218.) Moreover, the court noted that DSM-IV had been superseded by the fifth version of the DSM, which has a much broader definition for substance abuse disorders. (*Id*. at p. 1218, fn. 6.)

DCFS does not argue that there is sufficient evidence of substance abuse under any particular standard. The failure to do so is understandable. The evidence of mother's substance use is, at most, that she used edible marijuana while pregnant, to address her pregnancy symptoms, after having researched that it was a relatively safe alternative. She claims that she was never high or under the influence when she used it. She claims that she

16

easily stopped using as soon as she was told to do so; her drug tests support this. This is not substantial evidence – or any evidence – of substance abuse.

In contrast, DCFS simply assumes that mother's use of medical marijuana was harmful to Baby and rendered mother under the influence when caring for Toddler. The argument is more speculative than evidentiary. There is no evidence, for example, of the type of medical marijuana mother used, or whether the cannabinoids for which mother tested positive were those with psychoactive properties or merely those which affect pain. While the Department is unimpressed by mother's claimed research into the safety of the medical marijuana she used, it presented no contrary research into the risks of prenatal exposure to medical marijuana edibles.[5]

Department's only other evidence of substance abuse is its assumption that, based on the prior referral, mother had an "unaddressed history of substance abuse." The evidence of this – an inconclusive referral three years prior, contradicted by three intervening years of care for Toddler with no suggestions of drug use – is too insubstantial to support the finding.

---

[5] The sole evidence was that, at a joint visit with a Department social worker and public health nurse, the nurse told mother that "as [Baby] was prenatally exposed, there is a possibility he may show delays when he is older."

## 4. *Insufficient Evidence of Substantial Risk Arising From Substance Abuse*

Even if we were to conclude the evidence was sufficient that mother's *use* of medical marijuana edibles rose to the level of substance *abuse*, there is insufficient evidence that this abuse gave rise to a substantial risk of harm to the children.

"Although section 300 generally requires proof the child is subject to the defined risk of harm at the time of the jurisdiction hearing [citations], the court need not wait until a child is seriously abused or injured to assume jurisdiction and take steps necessary to protect the child [citation]. The court may consider past events in deciding whether a child currently needs the court's protection. [Citation.] A parent's ' "[past] conduct may be probative of current conditions" if there is reason to believe that the conduct will continue.' [Citation.]" (*In re Christopher R., supra*, 225 Cal.App.4th at pp. 1215–1216.)

Here, the record shows no risk of harm to the children. Although Toddler was indisputably in mother's care while she was consuming the marijuana edibles, there was no evidence of any risk to him. DCFS attempts to manufacture a risk based on mother's purported failure to obtain the necessary speech therapy; but the evidence indicates that mother did have Toddler evaluated prior to the non-detention hearing, and the school psychologist and language and speech specialist conducting the evaluation concluded there was no need for therapy. To the extent DCFS would find a risk of harm based on mother's failure to have Toddler evaluated when his pediatrician initially recommended it, the recommendation was in January 2018, and necessarily predated mother's

18

pregnancy and medical marijuana use. Therefore, mother's delay in following through could not have been attributable to her consumption of marijuana edibles.[6]

DCFS is left, then, with a single fact: that Baby tested positive for cannabinoids at birth. Department relies on authority that prenatal exposure to drugs creates a presumption of dependency. (*In re Christopher R., supra*, 225 Cal.App.4th at p. 1217; *In re Monique T.* (1992) 2 Cal.App.4th 1372, 1378; *In re Troy D.* (1989) 215 Cal.App.3d 889, 897.) The presumption arises not from case law, but from section 355.1. (*Troy D.*, at p. 897.) The statute provides, in pertinent part that, "[w]here the court finds, based upon competent professional evidence, that an injury, injuries or detrimental condition sustained by a minor is of a nature as would ordinarily not be sustained except as the result of the unreasonable or neglectful acts or omissions of either parent, . . . that finding shall be prima facie evidence that the minor is a person described by subdivision (a), (b), or (d) of [s]ection 300."

Application of this statutory presumption when a child is "diagnosed as being born under the influence of a dangerous drug," such as morphine

---

[6]    We reach a similar conclusion with respect to the Department's concern regarding mother taking Toddler off his hyperactivity medication, purportedly on the advice of a psychologist. The Department may disagree with mother's decision, and think it ill-advised, but does not tie it to mother's medical marijuana use. Mother had ceased using medical marijuana by the time Toddler's pediatrician placed him on psychotropic medication, and any reluctance she thereafter may have had regarding medicating her young child could not be attributable to her prior use of medical marijuana.

19

and methamphetamine, is clear. (*In re Troy D., supra*, 215 Cal.App.3d at pp. 894–895, 897.) Being born "under the influence of a dangerous drug" is obviously a "detrimental condition" within the meaning of the statutory presumption. Similarly, in *Monique T.*, the child not only tested positive for cocaine at birth, she also suffered severe medical problems from the drug use, requiring placement in a home for medically fragile children. (*In re Monique T., supra*, 2 Cal.App.4th at pp. 1374–1375.) This, too, is obviously a "detrimental condition" within the meaning of the statutory presumption. And in *Christopher R.*, the infant tested positive for cocaine, amphetamine and methamphetamine at birth, which the court held "unquestionably" endangered the child's health. (*In re Christopher R., supra*, 225 Cal.App.4th at p. 1217.)

In this case, we look in vain for "competent professional evidence" of an "injury, injuries or detrimental medical condition" sustained by Baby (§ 355.1). The evidence is that the child tested positive for cannabinoids at birth and did not appear to be developmentally delayed. At most, there was a possibility that he may show delays later.

Although understandably neither DCFS nor the trial court condones edible marijuana use while pregnant, DCFS acknowledges there is no injury, and the medical condition of prenatal exposure carries only some unexplained degree of possible future detriment. This is insufficient to trigger the presumption such that there is a substantial risk of harm to Baby from mother's admitted prenatal consumption of marijuana edibles.

20

### 5. *The Department's Totality Approach Does Not Change the Analysis*

As we have previously observed, the Department does not address the individual elements of substance abuse and substantial risk, but simply argues that, in an overall manner, the record supports the finding of dependency.

But the Department's analysis does not hold up. It relies on authority that a parent's substance abuse is prima facie evidence of substantial risk to children of tender years who require adequate supervision. (E.g., *In re Drake M., supra,* 211 Cal.App.4th at p. 766.) But, as discussed above, the evidence does not support a finding of substance abuse, so there is no prima facie evidence of substantial risk.

In summary, the only evidence is that mother used medical marijuana edibles during her pregnancy. There is no evidence this harmed either of her children. The Department relies on evidence that mother delayed in having Toddler's speech assessed, but her marijuana use did not cause the delay and, in any event, she obtained the assessment and Toddler's speech was age appropriate. The Department relies on evidence that mother was reluctant to put Toddler on psychotropic medication, but the evidence that she went against medical advice is inconclusive, and, again, there is no evidence that her medical marijuana use caused her reluctance. The Department relies on evidence that mother preferred to stay in grandmother's home rather than take her children to a shelter, despite the social worker's expressed concerns regarding grandmother's home; but there was no evidence grandmother's home presented a risk to the children, and, again, no evidence that mother's decision was in any way

impacted by her prior use of medical marijuana. Finally, the Department relies on evidence from a prior referral to infer mother had long-standing drug and mental health problems which were never addressed, yet the prior referral was closed as inconclusive, the petition in this case did not allege any mental health issues, and there is simply no evidence of drug use outside the medical marijuana edibles mother admitted using during pregnancy.

### 6.    *The Appeal is Not Moot*

After briefing was completed in this matter, we advised the parties of our intent to take judicial notice of the trial court's two minute orders of January 15, 2020, dismissing dependency proceedings. We gave the parties the opportunity to voice any objection. Neither party objected. Accordingly, we take judicial notice of the two orders.

We also directed the parties to address in supplemental letter briefs whether in light of the January 15, 2020 order terminating jurisdiction the appeal was now moot. The Department argues mootness by asserting dismissal of the dependency proceedings afforded mother the relief she sought by this appeal. Mother claims the matter is not moot because of potential collateral consequences to her family.

In deciding whether to dismiss an appeal as moot, we are guided by the general rule that " 'an appeal presenting only abstract or academic questions is subject to dismissal as moot.' [Citation.]" (*In re Jody* (1990) 218 Cal.App.3d 1615, 1621-1622.) "When no effective relief can be granted, an appeal is moot and will be dismissed." (*MHC Operating Limited Partnership v. City of San Jose* (2003) 106 Cal.App.4th 204, 214 [mobile home rent control challenge].) As the last cited case reveals, this

rule is not unique to dependency proceedings. (See also *Vernon v. State of California* (2004) 116 Cal.App.4th 114, 117 [FEHA and Civil Rights claims].) However, even in circumstances where effective relief can no longer be provided to a parent appealing jurisdictional findings, because that parent has since been awarded custody, courts have recognized they retain the inherent discretion to resolve the issue where "there is a likelihood of recurrence of the controversy between the same parties or others." (See, e.g., *In re N.S.* (2016) 245 Cal.App.4th 53, 59.)

We believe that this is an appropriate case in which to exercise discretion to address the jurisdictional errors, because the issue is one that is likely to recur in the future. If we fail to exercise our discretion to resolve the jurisdictional appeal, the Department may feel free to continue to pursue jurisdiction in other cases where there is no evidence of substance *abuse,* and no evidence of substantial risk – only evidence that a child was born testing positive for marijuana, bolstered only by vague and unproven concerns.

## DISPOSITION

The adjudication and disposition orders are reversed.

RUBIN, P. J.

I CONCUR:

MOOR, J.

23

In re J.A., et al.

B297416

BAKER, J., Dissenting

The mother of the very young minors at issue in this case, four-year-old J.A. and three-month-old D.Y., ingested marijuana—daily, according to her admission to hospital personnel—for the last four months of her pregnancy with D.Y.[1]  No surprise, D.Y. tested positive for marijuana at birth.  The mother claimed she used marijuana "'as an alternative for the pain and swelling associated with [her] pregnancy,'" but she admitted she never asked her prenatal doctor whether such marijuana use was safe (because the doctor would have "judged her") and instead did her own "research" by reading "articles online."[2]  And before D.Y. was born, the mother twice failed to promptly follow up on medical recommendations (including one made in November 2018, which was during the time she was admittedly ingesting marijuana) that she have her older son assessed

---

[1]    Mother also admitted to smoking cigarettes during her pregnancy.

[2]    Mother told the Los Angeles County Department of Children and Family Services (the Department) she concluded prescription medication would do more harm to her baby than ingesting marijuana.

for speech delays.[3]  Despite all this, when the Department filed a dependency petition, the juvenile court agreed to keep the minors in the mother's custody while assuming dependency jurisdiction over the minors to have better visibility into their welfare and provide protection against a substantial risk of serious physical harm.

In my view, the juvenile court's resolution was spot on.  Indeed, that resolution was not just the Department's recommendation below but also the recommendation adopted by counsel for the minors.  The majority nevertheless reverses—apparently of the view that mere court supervision of the family without removal of the children from the mother's custody is unjustifiable even under the deferential substantial evidence standard of review that applies.  Rather than catalog the ways in which the majority goes astray in reaching this conclusion, it suffices to observe the majority errs in so holding.


BAKER, J.

---

[3]     There is also evidence in the record of the mother's admissions, in connection with earlier referrals made to the Department, that she experienced mental health issues (including an anxiety attack in 2015 that resulted in her hospitalization because she wanted to kill herself by cutting) and attended a drug addiction program in 2016.