Filed 4/13/22  In re J.G. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| In re J.G., a Person Coming Under the Juvenile Court Law. | |
| | D079755 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| | (Super. Ct. No. EJ4682) |
| Plaintiff and Respondent, | |
| v. | |
| M.M., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Gary M. Bubis, Judge.  Affirmed.

Leslie A. Barry, under appointment by the Court of Appeal, for Defendant and Appellant.

Lonnie J. Eldridge, County Counsel, and Caitlin E. Rae, Chief Deputy Counsel for Plaintiff and Respondent.

M.M. (Mother) appeals dispositional orders entered in juvenile dependency proceedings declaring her daughter, J.G., a dependent pursuant

to Welfare and Institutions Code[1] section 361, subdivision (d) and ordering family maintenance services.  The San Diego County Health and Human Services Agency (the Agency) initiated the proceedings when J.G. was seven years old after her parents discovered she was being sexually abused by their roommate.

On appeal, Mother argues the juvenile court abused its discretion by ordering her to participate in a nonprotective parent group.  We disagree and affirm the orders.

### FACTUAL AND PROCEDURAL BACKGROUND

A.    *Initiation of J.G.'s Dependency Proceedings*

On August 20, 2021, the Agency received a referral that J.G. had been sexually abused by her family's roommate, D.A.  According to the referral, Mother and G.W. (Father)[2] had gone out and left J.G. in D.A.'s care.  When they returned home, Mother found J.G. and D.A. both naked in D.A.'s bed.  D.A. was lying face up and J.G. was lying face down on top of him.  Mother called law enforcement and the parents left the home with J.G.

Law enforcement then transported the family to Rady Children's Hospital so that J.G. could undergo a sexual abuse examination (SART exam).  During the SART exam, medical staff took a urine sample and a swab of J.G.'s neck.  However, Mother terminated the exam after J.G. began to feel uncomfortable.

Mother reported to the social worker that she spoke with J.G. the following day about what happened with D.A.  J.G. told Mother she asked D.A. to clean her up after she had defecated in her pull-up, and then started

---

[1]    Further statutory references are to the Welfare and Institutions Code.

[2]    Father is not a party to this appeal.

2

jumping on D.A.'s bed. Mother asked J.G. if D.A. touched her private part and J.G. said "no."

Mother further reported that the parents had known D.A. for 12 years. She discussed how D.A. paid the family's living expenses and said J.G. considered him to be "like a big brother, like family." She also told the social worker that D.A. had cleaned J.G. many times before. When the social worker asked Mother what she saw when she walked in and found J.G. in D.A.'s bed, she claimed she never saw D.A. naked but admitted he was not wearing a shirt or pants. She also confirmed that J.G. was naked and on top of D.A. She stated, "I just wish I would have spoken to [D.A.] about what I saw before going to the police. I feel like I have broken our trust of so many years over a complete misunderstanding. . . . This entire situation was blown out of proportion and that's my fault."

During J.G.'s interview with the social worker, she reported she was in D.A.'s room when her parents came home and that Mother started screaming, but she did not remember why. She reported she was naked and that D.A. did not have any clothes on when her parents came home. She also said she had a scratch on her stomach from when D.A. removed her clothes. When the social worker asked what they were doing in D.A.'s bed, J.G. looked down, her hands were closed in tight fists, she seemed frightened, was breathing rapidly, and said she did not remember anything else. At the forensic interview a few days later, J.G. denied having a roommate or knowing who D.A. was. She did not report any abuse or neglect and answered "I don't remember" for many questions.

The social worker also spoke to the detectives assigned to J.G.'s case. One of the detectives informed the social worker that J.G. had tested positive for a sexually transmitted disease (STD). However, Mother was refusing to

3

take J.G. to Rady Children's Hospital for further testing and treatment. Instead, Mother was planning to bring J.G. to her primary doctor but refused to provide the doctor's information. The detectives were concerned Mother was refusing medical care that was necessary to investigate the sexual abuse and treat J.G. for the STD, which could lead to further medical complications if not treated properly. The detectives were also concerned that Mother did not believe the abuse occurred. She repeatedly told the detectives she felt they were treating J.G. "too much like a victim," and that the incident with D.A. had all been a "misunderstanding."

The Agency filed a petition on September 1, 2021, under section 300, subdivision (d).[3] The petition alleged: "On or about August 20, 2021, [J.G.'s] roommate, [D.A.], a member of said child's household, sexually abused said child by lying in bed naked with the minor, who was also naked and sitting atop [D.A.] The minor subsequently tested positive for a sexually transmitted medical condition. The parents have refused to obtain the necessary medical testing of the minor which has delayed treatment and the mother vacillated about whether she believes the abuse even occurred, therefore, the child is in need of the protection of the Juvenile Court." In the detention report, the Agency recommended family maintenance services. The Agency also requested the juvenile court order no-contact between J.G. and D.A., and for an order requiring the parents to allow J.G. to receive a SART exam.

---

[3]    Section 300, subdivision (d) provides the juvenile court with jurisdiction when "[t]he child has been sexually abused, or there is a substantial risk that the child will be sexually abused, as defined in Section 11165.1 of the Penal Code, by the child's parent or guardian or a member of the child's household, or the parent or guardian has failed to adequately protect the child from sexual abuse when the parent or guardian knew or reasonably should have known that the child was in danger of sexual abuse."

4

At the detention hearing on September 2, 2021, the parents submitted on the Agency's recommendations. Mother's counsel addressed her refusal to allow J.G. to receive the SART exam, explaining Mother was worried the invasiveness of the exam would be traumatizing for J.G. However, Mother had since scheduled an appointment at Rady Children's Hospital for J.G. to undergo the exam. Mother's counsel further noted that the parents had obtained a temporary restraining order against D.A. and were pursuing a permanent restraining order against him. After hearing the parties' statements, the juvenile court found the Agency made a prima facie showing on the petition, ordered the parents to provide J.G. with all the necessary medical testing, and ordered no-contact between J.G. and D.A.

J.G. had the SART exam on September 9, 2021. J.G.'s urine and rectal samples taken during the exam tested positive for a sexually transmitted infection. Dr. Nicole Ayson, the child abuse specialist who conducted the exam, reported to the social worker that Mother insisted on a repeat urine test because she believed the test was incorrect. Mother also made comments that the medical staff and investigators were overreacting and causing her and J.G. more trauma. Dr. Ayson expressed concerns about Mother's ability to protect J.G., stating, "Caregivers who are incapable of recognizing that the child has been abused are unlikely to identify future abusive events or to respond to them in a protective fashion."

During subsequent interviews with the parents, the social worker determined that both parents had suffered their own "significant trauma" as children and lacked a strong support system. Mother was removed from her parents' home when she was a young child, stayed in group homes, and was on probation as a teenager. As for Father, he tested positive for drugs at

5

birth and spent some of his childhood in foster care. He was estranged from his family and began experiencing mental health issues as a teenager.

The social worker also noted that the parents struggled with homelessness and unemployment for several years leading up to the dependency proceedings. As a result, the family relied on D.A. for housing, and Mother described him as the "financial backbone" of the family. She stated she was still in contact with D.A. regarding the family's finances, but that D.A. had not been in the home or around J.G. She stated that detectives informed her that D.A. admitted to abusing J.G., and Mother was working on cutting all ties with him. She also reported that they had obtained a five-year restraining order against him.

The social worker also discussed with Mother whether she would be willing to participate in a nonprotective parent group. The goals of the group were to ensure the child remain safe in the parents' care and to provide the parents with education to prevent future abuse. The curriculum for the group, as described in the Agency's report, included the following: describing the types of denial of sexual abuse, and discussing the parent's own denial, reasons for the denial, and triggers for denial; identifying the emotional and behavioral effects of child sexual abuse and how to effectively and appropriately manage them if they appear; describing offender patterns of grooming, triggers, and opportunities or high-risk situations for abuse; describing components of safety planning and the parent's own prevention and intervention plan.

Mother stated that attending the nonprotective parent group would make her feel judged and she preferred individual therapy. She stated, "Now I truly realize that something happened. I want to know what, when, how, but do I really truly want to know? I've been overwhelmed and I want the

6

questions to stop and do as best we can, do as much as I can. I'm tired of [being] judged quite a bit because someone mistook what I said. We just want this to go away. With everyone involved it's not going away." The social worker noted that the services provided by the group were not punitive but intended to provide the parents with education to prevent future abuse and to help the parents process their own trauma associated with the sexual abuse of their child. The social worker asked Mother to try the group, and if she did not like it, the Agency could reassess if individual therapy was more appropriate.

Following this conversation, the social worker recommended in the Agency's jurisdiction and disposition report that Mother participate in the nonprotective parent group. The social worker further recommended Mother write a list of warning signs that indicated J.G. was being sexually abused by D.A., and the corresponding steps she planned to take if she sees these signs again.

In a subsequent interview, the social worker readdressed with Mother her willingness to participate in a nonprotective parent group. Mother indicated she had not followed up with the therapist to enroll in the group because her attorney advised her that she was not required to participate. She stated, "I'm tired, I feel like I'm having to defend everything." She also complained generally that the Agency did not need to be involved with their case, and she accused the social worker of having "speculated and lied" in the jurisdiction and detention report. She took specific issue with the social worker's recommendation that Mother should write a list of the warning signs that indicated J.G. was being abused. She claimed she could not comply with this recommendation because there were no warning signs, stating, "I'm not going to do that. I'm not going to perjure myself."

On October 8, 2021, the social worker contacted the therapist from the nonprotective parent group. The therapist reported that she had left two voicemail messages for Mother but had not heard back. When the social worker discussed this with Mother, Mother explained she found it unprofessional that the therapist had contacted her on a Saturday.

In the Agency's addendum report, the social worker noted that despite receiving an explanation of the purpose of the nonprotective parent group, Mother continued to discount the need or potential benefits of the services. Moreover, due to COVID-19 restrictions, the services were being offered as an individual therapy rather than in a group setting. The social worker stated, "Due to the parents' numerous complaints and vacillations between agreeing to services and stating the services are unnecessary, the Agency is concerned that the parents will not follow through with the services voluntarily." The social worker concluded the case was not appropriate for voluntary services and requested the juvenile court order Mother to participate in the nonprotective parent group.

B.    *Contested Jurisdiction and Disposition Hearing*

The contested jurisdiction and disposition hearing was held on November 12, 2021. At the hearing, the juvenile court received into evidence the Agency's detention report, the jurisdiction and disposition report, and the addendum report.

During her testimony, Mother stated that in the six years her family lived with D.A., she had no reason to believe he would sexually abuse a child. She also indicated she was fully cooperating with the district attorney in D.A.'s criminal case.

Mother also testified that J.G. began receiving therapy in 2020 based on behavioral problems she was having. After starting therapy, J.G. was

8

diagnosed with generalized anxiety disorder and separation anxiety disorder. Mother stopped taking J.G. to therapy after a few months because J.G. was not cooperating and Mother believed the therapy was no longer beneficial. Mother stated she was now committed to ensuring J.G. received trauma therapy and emphasized that her "main focus" was on J.G. receiving services to address the sexual abuse.

Mother claimed, however, that she did not need to participate in a nonprotective parent group. She expressed discomfort with the phrase "nonprotective parent," because it suggested she knew the abuse was happening, which she did not. She believed she would not benefit from the group because she was doing her "own education" and had begun to realize signs she missed that suggested J.G. was being abused. As an example, Mother cited a conversation she had with J.G. earlier that year, when J.G. told her that she did not want to use the same bathroom as D.A. When J.G. could not explain why she felt like that, Mother did not ask any follow-up questions. Additionally, Mother noticed J.G. was much calmer now that D.A. was no longer in the household. Mother also noted that D.A. suffered from his own disabilities, acted more like a child than an adult, and collected children's toys, which she now realized was inappropriate.

When asked if she was educated about warning signs for sexual abuse, Mother clarified that she had not received any formal education, and these were just her personal observations. She claimed, though, that she would not benefit from any education, because J.G. was no longer vulnerable to further abuse with D.A. out of the house. According to Mother, "[J.G.] does not go on outings. She does not go on sleepovers. She's always with [Father] and [me]." When asked by the juvenile court if she believed J.G. was at a greater risk of sexual abuse given her history of past abuse, Mother maintained that

J.G. is never outside the parents' presence. She admitted, however, that abuse could occur when J.G. is older and is allowed to go out with friends. The court also asked Mother if she was familiar with the word "grooming." Mother responded she had heard the word but was not familiar with it.

Following Mother's testimony, Father testified regarding his difficulties in childhood and that he was committed to J.G. receiving trauma therapy.

After the close of evidence, the Agency requested the juvenile court sustain the petition and order Mother's participation in the nonprotective parent group. The Agency noted Mother had little understanding of grooming or the red flags for future abuse, and her only plan to keep J.G. safe was isolating J.G. The Agency emphasized that the services offered by the group were educational rather than punitive, and contended Mother's court-ordered participation would help mitigate the risk of future abuse.

J.G.'s counsel joined in the Agency's arguments and requested the juvenile court maintain jurisdiction and adopt the Agency's dispositional recommendations. Counsel believed the parents would benefit from participating in the nonprotective parent group, as J.G.'s abuser was a long-term member of the household, and there was some indication the abuse was ongoing.

Mother's counsel countered that the juvenile court should dismiss the petition in its entirety. As to jurisdiction, counsel specifically objected to the allegations that Mother had delayed the medically necessary treatment for J.G., or that Mother ever vacillated about whether the abuse occurred. Counsel further contended that even if the court assumed jurisdiction, Mother should not be ordered to participate in the nonprotective parent group. Counsel emphasized that D.A. was no longer a threat to J.G.'s safety, and suggested that Mother could be educated about red flags for future abuse

10

through therapy with J.G. Further, the Agency had not identified any red flags the parents missed since J.G. never reported any abuse. For these reasons, counsel concluded that Mother did not need the services offered by the nonprotective parent group.

After closing arguments, the juvenile court made true findings on the petition by a preponderance of the evidence under section 300, subdivision (d). However, the court struck the allegations from the petition that the parents refused to obtain the necessary medical treatment, and that Mother vacillated about whether the abuse occurred. As to disposition, the court ordered a family maintenance plan and required the parents to participate in the nonprotective parent group. The court stated that the curriculum offered by the group would help both parents "deal with all of the potential problems that J.G. may be facing in the future." The court noted that survivors of sexual abuse often have difficulties in school and in their personal relationships, which particularly concerned the court given J.G.'s preexisting disabilities. The court recognized that the parents felt judged but emphasized that the purpose of the group was not to punish them but to prevent future abuse. The court then set the case for a review hearing on May 12, 2022.

Mother timely appealed.

DISCUSSION

Mother's sole contention on appeal is that the juvenile court abused its discretion by ordering her to attend the nonprotective parent group. She asserts that because the Agency did not allege in the petition that she failed to protect J.G. from the sexual abuse, the juvenile court erred by requiring her participation in the group. She further contends that there is no evidence to show that she failed to protect J.G. or that she would fail to protect J.G. in

11

the future, and concludes that the factual circumstances of this case do not warrant her court-ordered participation in a nonprotective parent group.

1.  *General Legal Principles and Standard of Review*

After the juvenile court finds jurisdiction under section 300, it must determine the appropriate disposition for the child.  (§§ 360, subd. (d), 361, 362; *In re N.M.* (2011) 197 Cal.App.4th 159, 169.)  The court's "principal concern" at the dispositional phase is the child's best interests.  *(In re Rodger H.* (1991) 228 Cal.App.3d 1174.)  Section 362, subdivision (a) provides that once a child is adjudged a dependent of the court, "the court may make any and all reasonable orders for the care, supervision, custody, conduct maintenance, and support of the child[.]"  Such orders may include a requirement that the parent participates in a counseling or education program.  (§ 362, subd. (d).)  In assessing how to support the child's welfare and safety, it is appropriate for the juvenile court to consider a parent's past conduct as well as present circumstances.  (*In re S.O.* (2002) 103 Cal.App.4th 453, 461; *In re Troy D.* (1989) 215 Cal.App.3d 889, 900.)  At the same time, dispositional orders must be " ' "appropriate for each family and be based on the unique facts relating to that family." ' [Citations.]"  (*In re Christopher H.* (1996) 50 Cal.App.4th 1001, 1006 (*Christopher H.*).)  The statute provides: "The program in which a parent or guardian is required participate shall be designed to eliminate those conditions that led to the court's finding the child is a person described by Section 300."  (§ 362, subd. (d).)

"The juvenile court has broad discretion to determine what would best serve and protect the child's interests and to fashion a dispositional order accordingly.  On appeal, this determination cannot be reversed absent a clear abuse of discretion."  (*In re Baby Boy H.* (1998) 63 Cal.App.4th 470, 474.)  However, since section 362 requires that the programs in which a parent is

required to participate "be designed to eliminate" the conditions that led to the assertion of jurisdiction, dispositional orders require facts showing the parent's participation in the specified program is reasonably necessary to address the conduct that brought the child within the court's jurisdiction. (*In re Drake M.* (2012) 211 Cal.App.4th 754, 770 ["rote assumption" that a parent could not be an effective single parent without parenting courses did not support the imposition of such courses]; *In re Jasmin C.* (2003) 106 Cal.App.4th 177, 180 [same]; see also *In re Sergio C.* (1999) 70 Cal.App.4th 957, 960 [dispositional order requiring father to submit to random drug tests reversed where only evidence of father's drug use was "unsworn and uncorroborated allegation"]; *In re Basilio T.* (1992) 4 Cal.App.4th 155, 172 [substance abuse component of dispositional order reversed where only evidence to support existence of substance abuse problem was mother's occasional odd behavior], superseded by statute on other grounds as stated in *In re Lucero L.* (2000) 22 Cal.4th 1227, 1239-1242.)

2.  *The Juvenile Court Did Not Abuse its Discretion by Ordering Mother to Participate in the Nonprotective Parent Group*

Mother contends there was an insufficient basis for the juvenile court's order requiring her participation in a nonprotective parent group. She notes that the Agency did not allege in the petition that she failed to protect J.G. from abuse, nor did the court make such a finding when it sustained the petition. She concludes that because there were no explicit findings involving her failure to protect, the court erred by ordering her to participate in the nonprotective parent group.

Contrary to Mother's contention, however, "[t]he problem that the juvenile court seeks to address [in a dispositional order] need not be described in the sustained section 300 petition." (*In re Briana V.* (2015) 236

13

Cal.App.4th 297, 311 (*Briana V.*).)[4]  For instance, in *Briana V.*, the juvenile court ordered the father to participate in sexual abuse counseling based on his criminal history of sexual assault, even though the court acknowledged there was no evidence the children were at risk of sexual abuse.  (*Briana V.*, at p. 307.)  On appeal, the father argued the imposition of sexual abuse counseling was improper because it was not reasonably necessary to eliminate the conditions that led to the dependency proceedings.  (*Id.* at p. 311.)  The court of appeal rejected this argument, explaining, "At disposition the juvenile court is not limited to the content of the sustained petition when it considers what dispositional orders would be in the best interests of the children.  [Citations.]  Instead, the court may consider the evidence as a whole."  (*Ibid.*)  The appellate court noted that the father's status as a registered sex offender was one of the conditions that led to the proceedings, and the evidence showed he had violated his probation by visiting schools, possessing children's clothing, having a computer, and caring for his children.  (*Id.* at pp. 311-312.)  Under those circumstances, the reviewing court was unable to say the court exceeded the bounds of reason by ordering him to attend sexual abuse counseling.  (*Id.* at p. 312.)

Similarly, in *Christopher H.*, *supra*, 50 Cal.App.4th 1001, although the juvenile court dismissed an allegation in the petition that the father's

_____

[4]    In fact, numerous courts of appeal have held that the juvenile court's dispositional orders can be imposed on the nonoffending parent.  (See *Briana V.*, *supra*, 236 Cal.App.4th at p. 311 ["[T]here need not be a jurisdictional finding as to the particular parent upon whom the court imposes a dispositional order"]; *In re I.A.* (2011) 201 Cal.App.4th 1484, 1492 ["A jurisdictional finding involving the conduct of a particular parent is not necessary for the court to enter orders binding on that parent, once dependency jurisdiction has been established"]; *In re A.E.* (2008) 168 Cal.App.4th 1, 5 [juvenile court was within its discretion to order nonoffending parent to participate in counseling].)

14

problems with alcohol negatively affected his ability to care for and supervise his child, the court ordered him to participate in random drug and alcohol testing. The Court of Appeal affirmed the order, relying on evidence in the record indicating that the father struggled with drug and alcohol abuse, stating, "[T]he [juvenile] court would have been remiss if it failed to address appellant's substance abuse even though that problem had not yet affected his ability to care for [the child]." (*Id.* at p. 1008.)

The foregoing authority demonstrates that the juvenile court is within its discretion to consider the "evidence as a whole" when formulating its dispositional orders and is not limited to the allegations in the petition. (*Briana V.*, *supra*, 236 Cal.App.4th at p. 307.) Accordingly, the absence of allegations in the petition regarding Mother's failure to protect J.G. from sexual abuse is not a basis on which this court can, as a matter of law, overturn the component of the dispositional order requiring her participation in the nonprotective parent group.

Mother attempts to distinguish her case from *Briana V.* and *Christopher H.*, contending that the record here is insufficient to support her court-ordered participation in a nonprotective parent group. She contends that although the facts in *Briana V.* and *Christopher H.* warranted the imposition of the specified programs, there is "simply no evidence" that one of her deficiencies was a failure to protect J.G. She asserts it is therefore unreasonable to require her to participate in a program designed to address a problem she does not have.

We conclude that the juvenile court did not abuse its discretion by ordering Mother to attend a nonprotective parent group. As stated throughout the dependency proceedings, the purpose of the nonprotective parent group was not to place blame on Mother or punish her. Rather, the

purpose of the group was to provide Mother with the tools to prevent future sexual abuse. The record indicates that Mother could benefit from these services, as she demonstrated a limited understanding of the dynamics of sexual abuse and was unable to articulate a comprehensive plan for protecting J.G. from future incidents of abuse. For example, Mother initially told the social worker she did not need to write down a list of warning signs that indicated J.G. was being sexually abused by D.A., because there were none and she did not want to perjure herself. She also testified during the jurisdiction and disposition hearing that she had no reason to believe D.A. was capable of sexually abusing a child. Yet she later testified on cross-examination that she did not need the group because she was able to recognize the red flags of abuse on her own. She then described how prior to discovering the abuse, J.G. started to use a different bathroom in the house because of D.A. She also could now recognize that D.A. had his own deficits and disabilities, acted more like a child, and collected children's toys.

Mother's inconsistent and vague statements regarding the warning signs of abuse suggested she may be unable to recognize the warning signs of abuse in the future. She also failed to acknowledge during her testimony that J.G. was sexually abused by a member of the family's household and long-term friend who the parents' depended upon financially. She also admitted she was not familiar with the word "grooming" when asked directly by the juvenile court. Mother's lack of familiarity with basic concepts of sexual abuse dynamics indicated she stood to benefit from the services offered by the nonprotective parent group. Indeed, an aspect of the group's curriculum provided parents with education on the warning signs of sexual abuse, including the patterns of grooming, opportunities for abuse, and high-risk situations.

Mother also lacked a realistic plan for protecting J.G. from further abuse. When asked how she was going to protect J.G. in the future, she indicated J.G. was no longer at risk of sexual abuse because she intended to keep J.G. isolated from friends and other social situations. However, Mother even admitted the limitations of this plan, as she acknowledged that there would eventually be times when J.G. was outside the parents' presence. The curriculum for the nonprotective parent group could help Mother address the deficiencies in her safety plan, since the curriculum included strategies for safety planning and formulating a prevention and intervention plan.

To support her argument that she should not be required to participate in the nonprotective parent group, Mother focuses on evidence in the record showing the appropriate steps she took to protect J.G. once she discovered the abuse, such as cooperating with law enforcement, obtaining a restraining order, and removing D.A. from the home. Although these efforts are laudable, this court cannot reweigh the evidence under the abuse of discretion standard of review. Instead, " ' "[t]he appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court. [Citations.]" ' " (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318-319.) Under the circumstances of this case, requiring Mother to participate in the nonprotective parent group does not exceed the bounds of reason. (*Briana V.*, *supra*, 236 Cal.App.4th at p. 312.)

17

DISPOSITION

The juvenile court's orders are affirmed.

IRION, J.

WE CONCUR:


HUFFMAN, Acting P. J.

AARON, J.